**Henry W. REID, Plaintiff–Appellant,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Defendant–Appellee.**

No. 93–2969.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1994.

Decided Feb. 28, 1994.

Counsel who presented argument on behalf of the appellant was Laurence D. Mass of Clayton, MO.

Counsel who presented argument on behalf of the appellee was Mark J. Cero of St. Louis, MO.

Before RICHARD S. ARNOLD, Chief Judge, HANSEN, Circuit Judge, and KOPF,* District Judge.

KOPF, District Judge.

Henry W. Reid (Reid) claimed he was owed disability insurance benefits under a policy issued by Connecticut General Life Insurance Co. (Connecticut General) providing coverage to him as an employee of Apex Oil Co. (Apex) for, among other things, total disability[1] due to mental disease or defect. The plan was governed by the Employee Retirement Income Security Act (ERISA) (29 U.S.C. § 1001 *et seq.*), and while the plan administrator was Apex, the policy provided that all claims were to be processed by Connecticut General.

Reid was relieved of all work responsibilities at Apex on February 20, 1985. He applied for benefits from Connecticut General in 1990 and filed this lawsuit in October, 1991. The policy required that written notice of a claim be provided within thirty days after the occurrence of the event on which the claim was based, and written proof of loss was required to be submitted within ninety days of the date of the loss for which the claim was made. The policy further

provided that no action could be commenced on the policy unless such action was brought within three years from the expiration of the time within which the proof of loss was required.

Connecticut General denied that it owed Reid benefits and claimed the company was prejudiced by his untimely claim for benefits. After a bench trial, the district court issued its opinion and judgment for Connecticut General, finding that the defendant had been prejudiced by Reid's late claim. This appeal followed. For the reasons stated below, the judgment of the district court[2] is affirmed.

**I.**

**A.**

The district court found the facts as required by Federal Rule of Civil Procedure 52(a). Since we believe none of the court's findings were clearly erroneous, we quote them below:

1. Plaintiff was an employee of Apex Oil Company ("Apex") from the beginning of 1976 to September 30, 1985. During 1984 and early 1985 he was an oil trader and was on the executive payroll and compensation plan of Apex.

2. Plaintiff rose to the level of Oil Trader and Director of Apex's international operations. In this position he supervised approximately 15 to 20 employees, including clerical, accounting, and operational personnel, and other oil traders. As an oil trader he had to collect information about the available buyers and sellers in the international markets, position Apex to benefit from price fluctuations, anticipate market movements, and keep abreast of Apex's daily oil position. Plaintiff also oversaw the operations section of Apex's international trading which involved scheduling the loading and unloading of tankers.

---

* The HONORABLE RICHARD G. KOPF, United States District Judge for the District of Nebraska, sitting by designation.

1. The policy defined disability as a sickness or accidental bodily injury which "disables an Employee so that he is completely prevented from performing the duties of his occupation or employment...."

2. The Honorable Donald J. Stohr, United States District Judge for the Eastern District of Missouri.

3. Paul A. Novelly, President of Apex, relieved plaintiff of his duties with Apex on February 20, 1985. However, Apex continued to pay plaintiff his salary of $10,000.00 per month through September 30, 1985. When he was relieved of his duties, plaintiff was the second highest paid employee of Apex other than Mr. Novelly.

4. Plaintiff was treated for mental illness continuously from April 1984 until the end of 1988. He was also treated for alcoholism during this period. When Mr. Novelly relieved plaintiff of his duties on February 20, 1985, he determined that plaintiff was no longer performing satisfactorily the duties of his job.

5. Plaintiff did not work from the time he was terminated at Apex until May 1986. In May 1986 plaintiff became employed by Thomson McKinnon, a stock brokerage firm, as a stock broker trainee. He remained there until July 30, 1986. During his employment at Thomson McKinnon, plaintiff spent most of his time studying for the examination to become a licensed stock broker.

6. On July 30, 1986, plaintiff was admitted to St. Mary's Hospital for psychiatric care. He stayed there until August 13, 1986. He received shock treatment while an inpatient at St. Mary's. He had received other shock treatments prior to his hospitalization under the prescription of Dr. Raymond Knowles.

7. Dr. Raymond Knowles, a licensed doctor and certified psychiatrist, treated plaintiff from April 1984 until the end of August 1986. He diagnosed plaintiff as having a major depressive illness throughout the time he treated plaintiff. He secondarily diagnosed plaintiff as being abusive of alcohol.

8. On July 25, 1990, in a deposition used at trial, Dr. Knowles testified that it was his opinion that plaintiff was disabled and incapable of doing any work from the end of April 1984 until August 1986, when he discontinued treating plaintiff. However on a Reliance Standard Life Insurance Company ("Reliance") claim form, signed on January 22, 1987, Dr. Knowles wrote that from December 1985 until May 1986,

he treated plaintiff for a nondisabling depression which worsened. He labeled plaintiff as being totally disabled as of July 30, 1986 when he entered St. Mary's Hospital.

9. Dr. Knowles did not keep any notes from plaintiff's weekly visits because Dr. Knowles wanted to protect plaintiff in plaintiff's earlier litigation with Apex in which plaintiff sought deferred compensation.

10. Dr. Marcel Saghir, a licensed doctor and certified psychiatrist, treated plaintiff from November 1986 until 1990. It was his opinion with a reasonable degree of medical certainty that plaintiff was disabled from working from November 1986, when he first started treating plaintiff, continuously until after 1988. He also believed that plaintiff was disabled from working for two years before he started treating plaintiff, based upon plaintiff's medical records and medical history, but he could not determine that with a reasonable degree of medical certainty because he did not treat plaintiff before November 1986. Dr. Saghir stated in reports he submitted to Reliance and Provident Life and Accident Insurance Company ("Provident") that plaintiff was disabled from working after November 1986.

11. After plaintiff was hospitalized Thomas [sic] McKinnon informed plaintiff that he might be eligible for disability benefits under a group insurance policy with Reliance for Thomson McKinnon employees. Plaintiff's wife assisted filling out the necessary forms for processing the claim with Reliance. On the forms, plaintiff's wife indicated that plaintiff's disability began on July 30, 1986. Reliance paid benefits, after a ninety day waiting period, for 24 months, the maximum under the policy. The payments were $1,200 per month from October 28, 1986 through October 28, 1988. The payments were based upon reports confirming plaintiff's inability to perform work submitted to Reliance by Dr. Knowles and Dr. Saghir.

12. Plaintiff had personally paid for a disability insurance policy issued by Provident. Plaintiff's wife completed the appli-

cation for benefits under the Provident policy. On the application plaintiff's wife indicated that plaintiff's disability began on July 30, 1986. Plaintiff received benefits pursuant to that policy from November 1986 through the first half of 1991. The payments were based upon reports confirming plaintiff's inability to perform work submitted to Provident by Dr. Knowles and Dr. Saghir. Thereafter, plaintiff reached a settlement of his claim for further payments under that policy.

13. While plaintiff was employed at Apex, defendant provided a policy of disability insurance covering employees of Apex. Defendant's policy required that written notice of a claim be given to defendant within 30 days after the occurrence of the event on which the claim was based and written proof of the claim was required to be submitted with 90 days of the date of the loss for which the claim was made. There was a five month waiting period before benefits under the disability policy were due. Defendant's policy also provided that no action at law or in equity may be brought to recover under the policy unless such action was brought within three years from the expiration of the time within which proof of loss was required.

14. Plaintiff, through his attorney John Boeger, first notified defendant of his claim for disability insurance benefits under the above-mentioned policy on October 17, 1990. The claim was based on mental illness from February 1985 until and through the time of submitting his claim to defendant. The claim was filed over five years after the onset of plaintiff's alleged disability.

15. Enclosed with John Boeger's letter of October 17, 1990 were group long term disability claim forms filled out by plaintiff and Dr. Knowles. On the form completed by plaintiff, he indicated that he became totally disabled in February 1985. Dr. Knowles wrote, on the form he completed, that plaintiff's disability commenced in April 1984 and that plaintiff "was totally disabled from regular occupation" as of August 21, 1986.

16. On November 6, 1990, Mr. Boeger wrote defendant asserting that plaintiff did not file written proof of loss within 90 days after the date commencing the disability because of plaintiff's medical condition and because the subsequent litigation with his ex-employer "complicated matters".

17. Throughout the next year Boeger and defendant corresponded regarding plaintiff's claim. Defendant requested additional information concerning plaintiff's claim and eventually received the following documents: (1) the depositions or portions thereof of Dr. Knowles, Dr. Saghir and Paul A. Novelly, which were taken for the arbitration of *Henry Reid v. Apex Oil Company;* (2) plaintiff's medical records from Dr. Knowles, Dr. Saghir and St. Mary's Hospital; (3) Reliance and Provident's records on plaintiff's disability claims; and (4) a Summary Plan Description of the Disability Plan of Apex.

18. In March 1991 defendant wrote to Mr. Boeger that it was seeking information from Thomson McKinnon (now Prudential–Bache) concerning plaintiff's employment and the scope of his duties at Thomson McKinnon. Defendant stated that its liability to plaintiff depended on whether its rights have been prejudiced by plaintiff's extremely late filing of his claim and that defendant was trying to reasonably investigate the facts surrounding plaintiff's alleged disability. After defendant informed Mr. Boeger that plaintiff's supervisor at Thomson McKinnon was unable to clarify plaintiff's duties at Thomson McKinnon, Mr. Boeger provided defendant with plaintiff's affidavit describing his duties while employed at Thomas McKinnon [*sic*].

19. Defendant received the Provident file on April 23, 1991 and the Reliance file on August 7, 1991. Consequently, in August 1991, defendant had three separate opinions from Dr. Knowles regarding plaintiff's disability: (1) Dr. Knowles's [*sic*] January 22, 1987 signed statement on a Reliance claim form that from April 19, 1984 through May 1986 plaintiff suffered a nondisabling depression which only became severe enough to disable him in July 1986; (2) Dr. Knowles' deposition testimony of July 25, 1990 indicating that plaintiff

was totally disabled from his regular occupation from April 19, 1984 through the end of his treatment in August 1986; and (3) the application for benefits signed by Dr. Knowles on September 25, 1990, directed to defendant, in which Dr. Knowles indicated that as of August 21, 1986 plaintiff was totally disabled from his regular occupation.

20. Plaintiff commenced this lawsuit on October 22, 1991. He seeks money damages for a 24 month period commencing from July 20, 1985 through July 20, 1987, plus interest.

(Citations omitted.)

### B.

The district judge declined to consider two depositions taken after this suit was commenced. However, the judge indicated that even had he considered this "new" evidence, his decision would have been the same. We shall briefly summarize these two depositions.

Paul A. Novelly was deposed on November 7, 1992. He was president of Apex, and he relieved Reid of his duties. Novelly testified that Reid had been a productive employee until the last six months of his employment. In layman's terms, Novelly believed Reid was having a nervous breakdown at the time he was relieved from duty.

Dr. Robert Raymond Knowles, Reid's first psychiatrist, was deposed on November 21, 1992. Dr. Knowles testified that in his opinion Reid was incapable of performing his duties at Apex because of mental illness. The doctor endeavored to reconcile differences in statements he had made on forms for various insurance companies and in an earlier deposition.

Dr. Knowles testified that even though Reid's illness disabled him from performing his duties at Apex, mental illness did not disable Reid from attempting to do the relatively low-level job of stockbroker trainee at Thomson McKinnon. Had any representative of Connecticut General asked Dr. Knowles to reconcile the conflict that appeared among the different claim forms and his earlier deposition, Dr. Knowles would have responded as he did in the November, 1992, deposition.

### II.

### A.

The district court applied a de novo standard of review in this case. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). At trial, Connecticut General objected to any new evidence presented to the trial court for purposes of reviewing the denial of the claim. Connecticut General took the position that de novo review meant the district court was limited to reviewing only the evidence that Connecticut General had before it when it evaluated Reid's claim.

Reid, however, argued that the district court was required to accept, upon good cause shown, and consider additional "new" evidence which the insurance carrier did not have during the claims process, that is, the depositions of Mr. Novelly, Reid's former employer, and Dr. Knowles, his former psychiatrist. These depositions were intended to supplement earlier depositions.

The district court declined to consider this "new" evidence on the grounds that it was simply an attempt to clarify evidence previously given to Connecticut General and could have been provided before the lawsuit was filed. In addition, the court stated that even if it had considered the new evidence, it would not have changed the outcome of this action.

We need not determine whether the district court was required to consider the "new" evidence because the court stated that the "new" evidence would not have changed the court's ruling and because after review of the record, including the "new" evidence, we are satisfied that reversal is not warranted.

### B.

The district court concluded that no federal law set out the legal standard for determining the effect of a late claim on a person's eligibility for benefits under ERISA. As a result, the district court applied Missouri

disabled

**1098**

state law. Both parties agreed with this approach.

However, we believe that where there is no federal statutory law to apply in ERISA litigation, "federal common law," not state law, should be applied. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56, 107 S.Ct. 1549, 1557–58, 95 L.Ed.2d 39 (1987) (Courts are to develop a "federal common law of rights and obligations under ERISA-regulated plans."). Nevertheless, since the parties are not in disagreement, the matter has not been briefed, and Missouri law appears to be the most favorable to Reid[3] insofar as its treatment of late claims is concerned, we assume, without deciding, that Missouri law is representative of the "federal common law." *See, e.g., Lyman Lumber Co. v. Hill,* 877 F.2d 692, 693 (8th Cir.1989) (in fashioning a body of federal common law, court may look to state law for guidance); *Anderson v. John Morrell & Co.,* 830 F.2d 872, 877 (8th Cir.1987); *Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344, 1351 (8th Cir.1980) (Congress intended that a body of federal substantive law be developed to fill in the gaps left by ERISA's express provisions.).

In order to avoid liability where an insured has made a prima facie showing of a right to recover under an insurance policy, Missouri law requires the insurer to establish as an affirmative defense that it was prejudiced by a late claim in the sense that the company could not adequately investigate or defend the claim. *Ralston Purina Co. v. Home Ins. Co.,* 760 F.2d 897, 899–900 (8th Cir.1985); *Greer v. Zurich Ins. Co.,* 441 S.W.2d 15, 31–34 (Mo.1969); *Dickhans v. Missouri Property Ins. Placement Facility,* 705 S.W.2d 104, 106–07 (Mo.Ct.App.1986). Prejudice is not presumed from mere delay in giving notice. *Katz Drug Co. v. Commer-*

*cial Standard Ins. Co.,* 647 S.W.2d 831, 836 (Mo.Ct.App.1983).

### C.

#### 1.

The presence or absence of "prejudice" in this context is a finding of fact. *Greer,* 441 S.W.2d at 31–32.

> Ordinarily, whether a delay by the insured in notifying the liability insurer of an accident and in forwarding suit papers constitutes a material breach of the policy conditions *is a fact issue* to be determined on the particular facts of each case....
>
> One of the factors to be considered by the *trier of facts* ... is whether the insurer has been prejudiced....

*Id.* (emphasis added); 13A *Couch on Insurance 2d* § 49.50, at 281 (citations omitted).

When a district court conducts a de novo review of an ERISA fiduciary's denial of benefits, the district court's findings of fact are customarily reviewed by this court under the "clearly erroneous" standard. *Donatelli v. Home Ins. Co.,* 992 F.2d 763, 765 (8th Cir.1993); *Dvorak v. Metropolitan Life Ins. Co.,* 965 F.2d 606, 609–10 (8th Cir.1992). *See also Greer,* 441 S.W.2d at 32–33 ("On this and other evidence which need not be related, the trial court found that Zurich had been prejudiced by reason of the delayed notice. Considering all the evidence, the trial court's judgment in this regard cannot be said to be clearly erroneous and is affirmed.").

A factual finding is clearly erroneous when, although there is evidence to support it, the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Budden v. United States,* 8 F.3d 1278, 1282 (8th Cir.1993) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

---

3. The courts have generally taken three approaches in late claims cases. Without consideration of prejudice to the insurance company, some jurisdictions consider a timely claim as a condition precedent to recovery on the part of the insured. 13A George J. Couch et al., *Couch Cyclopedia of Insurance Law* § 49.49, at 276–77 (2d ed. 1982) [hereinafter *Couch on Insurance 2d*]. Other jurisdictions presume prejudice to the insurer and treat the untimely claim as a failure to satisfy a condition precedent unless the insured can demonstrate the absence of prejudice. *Id.* § 49.50, at 281. Still other jurisdictions (such as Missouri) place the burden of proving prejudice on the insurer and do not consider a late claim as a failure of a condition precedent unless the insurance company meets its burden of proof. *Id.*

**2.**

The district court based its finding of "prejudice" on five factors. We do not believe the district court's findings in this regard were clearly erroneous.

First, the court found that there was a good faith dispute as to when Reid became disabled, particularly given Dr. Knowles' seemingly inconsistent statements as to the onset of total disability.

Second, the court believed that even if the insurance company had considered Dr. Knowles' 1992 explanation of his prior inconsistent statements, Connecticut General would have had legitimate reason to doubt the credibility of Dr. Knowles. The company would therefore have been justified in attempting to independently verify the onset of total disability through another doctor.

Third, the court was persuaded that Dr. Knowles purposely did not keep adequate notes of his treatment of Reid in order to protect Reid in other litigation regarding deferred compensation. Thus, Dr. Knowles' records could not serve as a basis for a meaningful review.

Fourth, the court found that in the absence of a credible opinion from Dr. Knowles, and lacking adequate records maintained by Dr. Knowles, Connecticut General could not obtain a physician's opinion concerning Reid's condition to a reasonable degree of medical certainty given the five-year passage of time between the alleged onset of total disability and the claim. According to the court, this fact was evidenced by Reid's second psychiatrist, Dr. Saghir, who testified that he could not determine with a reasonable degree of medical certainty the extent of Reid's disability in 1985 because he had not treated Reid during that period of time.

Fifth, the court recognized that Reid (a) was aware of the group insurance through Apex, (b) never claimed to be ignorant that he had a claim, and (c) made claims for disability benefits to other insurance companies in 1986. Hence, there was no justifiable reason why Reid could not have made a timely claim to Connecticut General that would have provided the company with an adequate opportunity to obtain appropriate medical review of his claim.

**3.**

Reid initially seems to argue that Connecticut General failed to seriously question his total disability and thus failed to prove "prejudice." In this regard, Reid argues that (a) there really was no question that he could not perform as an oil trader, (b) total disability as defined by the Connecticut General policy meant the inability to perform as an oil trader and not some other job, and (c) Connecticut General's prejudice claim was pretextual. We think Reid misunderstands "prejudice" under Missouri law.

■ "Prejudice" under Missouri law can certainly mean that an insurance company is obligated to pay something as a result of a late claim which it would not have been obligated to pay had the claim been timely, as in the case of the failure to notify a liability carrier of a defensible lawsuit. *Cf. Greer*, 441 S.W.2d at 32. However, "prejudice" can also mean simply that the insurance company was not given a meaningful opportunity to make its own preliminary investigation where such an investigation is called for on the facts of a particular case. *Id.* (Although insured was represented at trial by competent counsel, insurance company was nevertheless prejudiced by late notice because the late notice precluded the company from making its own preliminary investigation, selecting its own trial counsel, and deciding whether to settle.).

Indeed, the obvious purpose of giving an insurance company timely notice of a claim is "to enable the insurer *to inform itself by investigating the circumstances while the matter is fresh in the minds of all....*" 13A *Couch on Insurance 2d* § 49.37, at 260 (emphasis added) (citations omitted).

■ We emphasize that this is not a case where a preliminary inquiry by the insurance company was uncalled for. Dr. Knowles stated in a deposition that Reid was disabled prior to February, 1985. He also stated on a Reliance Standard Life Insurance Co. (Reliance) claims form that Reid suffered from a nondisabling depression which only became

severe enough to disable him in July, 1986. On a claim submitted to Connecticut General, Dr. Knowles stated that Reid "was totally disabled from regular occupation" as of August 21, 1986. From May through July, 1986, Reid was employed as a stockbroker trainee. Reid's wife indicated on two claims forms that his disability commenced in July, 1986. Under these circumstances, we do not believe the district court was obligated to find that Connecticut General's claim of prejudice was a pretext.

Reid next argues that the district court misread Dr. Saghir's testimony, and, in any event, inappropriately applied the "reasonable degree of medical certainty" standard to the claims process. We are also unpersuaded by these arguments.

Although Reid may or may not have a plausible explanation for why Dr. Saghir stated that he could not testify to a "reasonable degree of medical certainty" as to whether Reid was disabled at Apex, we do not believe the district court misread the testimony. The doctor clearly said what the district court attributed to him. That the district court was unconvinced by Reid's explanation of the meaning of Dr. Saghir's testimony does not render the district court's findings or conclusions incorrect.

Moreover, we do not think the district court's reliance on Dr. Saghir's inability to give an opinion to a "reasonable degree of medical certainty" was misplaced. While it is true that none of the claims forms required that opinions be expressed to "a reasonable degree of medical certainty," that is beside the point.

Context is everything. In this case, Dr. Saghir's testimony was pertinent because Dr. Knowles had given inconsistent statements and had not kept adequate records. Dr. Saghir's testimony illustrated the real dilemma Connecticut General was confronted with: On one hand, Connecticut General was faced with inconsistent statements from the only treating physician who had dealt with Reid during the critical time frame. On the other, Dr. Saghir would not put his professional reputation in jeopardy by expressing a reasonably certain medical opinion because he had not treated Reid at the critical time. In essence, Connecticut General was left without a trustworthy contemporaneous medical opinion that Reid was disabled.

Finally, Reid argues that Dr. Knowles fully explained his seemingly inconsistent statements in his 1992 deposition. Dr. Knowles essentially testified that any statements he made that Reid was not disabled referred to his opinion that Reid could attempt to do a less demanding job, such as stockbroker trainee, as opposed to the stressful occupation of oil trader. While the district court would not have been in error had it been convinced by the doctor's explanations, the court was not obligated to accept his explanation.

Since the district court's finding of prejudice was not clearly erroneous, the judgment of the district court is affirmed.