MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.
This is an action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq. Plaintiff, Mary Faye Parker, as a designated beneficiary, seeks recovery of accidental death benefits. Plaintiffs son, Timothy Parker, was insured under a group policy covering the employees of Danaher Corporation. The court has before it for de novo review the administrative record that the parties have stipulated constitutes the entire record made before the administrator and the briefs of the parties. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The sole issue is whether a death resulting from a man’s hanging himself by the neck in order to restrict the flow of oxygen to his brain during an act of sexual gratification is an accidental death within the meaning of an accidental death insurance policy.

Background.

The plaintiff has named as defendants Danaher Corporation on behalf of Danaher Corporation Employee Benefit Plan, A.I.G. Life Insurance Company, and American International Adjustment Company, Inc. *1289 A.I.G. Life Insurance Company on April 1, 1990, issued to Danaher Corporation a policy of group life insurance, master policy no. BSC 8038446, covering all Danaher Corporation employees.[1] The policy of insurance was in full force and effect at the time of the death of Timothy Parker an employee of Danaher Corporation, formerly EASCO Hand Tools. American International Adjustment Company, Inc., is the trustee and administrator of the Danaher Corporation Employee Benefit Plan.
Plaintiff was the named beneficiary on the policy of life insurance furnished by her deceased son’s employer. On November 27, 1990, plaintiffs son, Timothy E. Parker, was found dead in his apartment in Fayetteville, Arkansas. A $10,000 life insurance benefit was paid to the plaintiff but the insurance company has refused to pay the additional $10,000 accidental death benefits.
Timothy Parker died by asphyxiation while hanging himself in an attempt to increase sexual gratification from masturbation. An event known as autoerotic asphyxiation. See generally, Alan Stephens, Annotation, Accident or Life Insurance: Death by Autoerotic Asphyxiation as Accidental, 62 A.L.R.4th 823 (1988). The practice has been described as an act of autoerotic stimulation by means of a noose tightened around the neck for the purpose of temporarily restricting the supply of oxygen to the brain in an attempt to intensify the sensations of masturbation. Id. See also Sigler v. Mutual Benefit Life Ins. Co., 663 F.2d 49 n. 2 (8th Cir.1981). Unfortunately, in this case performance of the autoerotic act resulted in the death of Timothy Parker.
The circumstances surrounding his death are not in dispute. Mr. Parker was found with a bed sheet wrapped around his neck and over the shower door frame. Specifically the report of the police department contains the following description of the manner in which Mr. Parker was found:
There was a green sheet tied to the top rail [of the shower doors], with the rest of the sheet down, wrapped around and secured on the deceased neck covering the face. Once the sheet was removed the body was brought out of the bathroom and laid on top of a body bag. The deceased was dresses (sic) in a blue pull over shirt and red shorts. The deceased had what appeared to be two soft balls inserted up his shirt around the breast area indicating the appearance of female breast (sic). A large rise was noted in the groin area of the body. These items were removed and was (sic) noted as being assorted clothing items.
Stipulated Record, Claims File (hereinafter S.R.) at 16.
The manner in which Mr. Parker was found as well as other evidence found in or around his person suggested death secondary to self-induced hypoxia associated with au-toerotic stimulation. The parties agree that Mr. Parker died as a result of autoerotic asphyxiation.
The police investigators and the coroner labelled Mr. Parker’s death as accidental. The death certificate also lists the manner of death as an accident. The only dispute is whether the death can be called “accidental” within the meaning of the ERISA plan at issue.
The life insurance policy insures for loss “resulting from injury.” Stipulated Record, Policy File, at 1. Injury is defined to mean “bodily injury caused by an accident occurring while this policy is in force as to the Insured Person and resulting directly and independently of all other causes in loss covered by this policy.” Id. The policy does not further define the term “accident.”
On September 27, 1991, the claim for the accidental death benefits was denied. The reason given was that based on the above quoted policy definition of injury the “circumstances surrounding Mr. Parker’s death indicates that this death was not accidental as defined in the policy.” S.R. at 21. This decision was affirmed by the ERISA Appeals Review Committee on November 20, 1991. S.R. at 27. In a letter dated January 22, 1993, Philip R. Harbottle, claims branch manager, advised plaintiff’s counsel that the *1290 committee’s decision was final. The letter further stated:
The investigation reports of the Fayette-ville Police Department, Coroner’s office, and EMS all reveal that the Deceased had intentionally and deliberately tied a bed sheet around his neck with the intent to cut off the flow of blood and/or air. Although the Deceased may not have intended to commit suicide, this deliberate intentional act was too great of a risk for a prudent man to not be acutely aware of the danger. Therefore, this death was not caused by an accident as required under the definition of injury.
S.R. at 86.

Discussion.

Plaintiff citing Estate of Wade v. Continental Insurance Company, 514 F.2d 304 (8th Cir.1975), advises the court that the determination of whether an injury is accidental must be made from the point of view of the insured and what he intended or reasonably should have expected. It is pointed out that research into this particular sexual phenomena suggests that autoerotic asphyxiation is a repetitive pattern of behavior that individuals engage in over a period of years and that the intent of the individuals performing this act is not death.
Plaintiff candidly admits that the jurisdictions that have addressed this issue are split as to a beneficiary’s right to recover accidental death proceeds following the death of an insured as a result of autoerotic asphyxiation. However, plaintiff argues that when Arkansas law is applied the conclusion must be that Timothy Parker’s death was accidental. Plaintiff informs us that under Arkansas law proof of death of an insured from injuries received by him raises the presumption of accidental death within the meaning of an insurance clause insuring against death by external, violent and accidental means, and such presumption of accidental death continues until overcome by affirmative proof to the contrary on the part of the insurer. Cockrell v. Life Insurance Company of Georgia, 692 F.2d 1164 (8th Cir.1982). Plaintiff also argues that the term “accidental” is ambiguous and that any ambiguity should be resolved in favor of the insured.
Defendants argue that under the applicable law we must construe the language without giving deference to the interpretation of either side. It is pointed out that the accidental death finding of the police investigators and the coroner was made because of their conclusion that Mr. Parker did not commit suicide. Accepting these findings as true, the defendants argue that this death was not an accident. Defendants state that under any common sense understanding of the term death resulting from hanging one’s self from a shower rod with a bed sheet is not accidental. While there is no evidence that Timothy Parker planned his death, defendants argue that the death was certainly not an unforeseen circumstance of the activity. Considered thusly, defendants argue his death was not an accident. As Parker fully intended to perform the life threatening act, defendants point out that the act which caused his death was both planned and intended and was not an accident under the common ordinary meaning of the term “accident.”
In applying the de novo standard of review, the “straightforward language in an ERISA-regulated insurance policy should be given its natural meaning.” Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489 (1st Cir.1989) (citation omitted). “In conducting a de novo review, the court is bound by the provisions of the documents establishing an employee benefit plan “without deferring to either party’s interpretation.’ ” Brown v. Ampco-Pittsburgh Corp., 876 F.2d 546, 550 (6th Cir.1989) (citation omitted). See also Wallace v. Firestone Tire & Rubber Co., 882 F.2d 1327, 1329 (8th Cir.1989).
We must also reject plaintiffs request that we construe any ambiguities in favor of the insured. In Brewer v. Lincoln National Life Ins. Co., 921 F.2d 150, 153 (8th Cir.1990), cert. denied, - U.S. -, 111 S.Ct. 2872, 115 L.Ed.2d 1038 (1991), the Court of Appeals for the Eighth Circuit specifically rejected the contra insurer rule noting that neither party’s construction can be favored. We also reject application of the Arkansas accidental death presumption. See Cockrell v. Life Ins. Co. of Georgia, 692 F.2d 1164 (8th Cir.1982) (applying presumption of *1291 accidental death under Arkansas law). We believe application of this presumption would be contrary to the principles of ERISA and the teachings of Brewer.
While there is no federal statutory law to apply in ERISA litigation, it is federal common law rather than state law that applies. Reid v. Connecticut General Life Ins. Co., 17 F.3d 1092 (8th Cir.1994). However, in fashioning a body of federal common law, the court may look to state law for guidance unless state law is contrary to the provisions of ERISA. Id.; Brewer, 921 F.2d at 153. Section 1022(a)(1) requires an employee benefit plan to furnish a plan description that is “written in a manner calculated to be understood by the average plan participant....” 29 U.S.C. § 1022(a)(1). In light of this requirement, the Brewer court held that “[i]t would be improper and unfair to allow experts to define terms that were specifically written for and targeted toward laypersons. This requirement provides a source from which we may fashion a federal common law rule; the terms should be accorded their ordinary, and not specialized, meanings.”. Brewer, 921 F.2d at 154.
As the parties note, there are a number of reported decisions involving autoerotic asphyxiation in the context of claims for life insurance benefits. Several of these decisions deal with whether the death is the result of self-inflicted injury within the meaning of the relevant policy language. One such case is Sims v. Monumental General Ins. Co., 960 F.2d 478 (5th Cir.1992) (non-ERISA case). In Sims the issue was whether the death resulted directly of indirectly from an intentionally self-inflicted injury. The Court of Appeals for the Fifth Circuit, applying Louisiana law, held that the type of partial strangulation the actor intends to achieve in these situations was an intentional self-inflicted injury within the meaning of the policy. The court found unavailing the fact that the actor only intended partial strangulation and did not intentionally kill himself. The court heard undisputed expert opinion that the type of strangulation desired in such eases damages tissues in the neck and deprives the brain of valuable oxygen.
In so holding the court used the following analogy:
If Mr. Brumfield had been a member of a fraternal organization that required him to brand his forearm, and he did so, any loss arising from the branding would be excluded. For instance, although he only intended to burn the insignia of the organization onto his skin, he might unintentionally burn into his muscle and do serious damage to his arm. He intended some injury, but another, unintended injury resulted. The loss would not be covered by the policy at issue here.
Id. at 480. The court held that he “intentionally injured himself, even though he did not mean to kill himself, and that his death [was] not covered under the policy.” Id. at 479. The court did not reach the issue of whether the death was “accidental” within the meaning of the policy. Id. at 480 n. 3.
In Sigler v. Mutual Ben. Life Ins. Co., 663 F.2d 49 (8th Cir.1981) (non-ERISA case) the Court of Appeals for the Eighth Circuit, applying Iowa law, dealt with a similar case. The trial court ruled that “the insured’s cause of death, autoerotic asphyxia, was self-inflicted injury resulting in death which under Iowa law was not an accident, ‘since a reasonable person would have recognized that his actions could result in his death.’ ” Id. at 49, quoting, Sigler v. Mutual Benefit Life Insurance Co., 506 F.Supp. 542, 544 (S.D.Iowa 1981). The district court additionally held that the death “was barred from recovery because of a clause in the insured’s policy excluding coverage from ‘intentionally, self-inflicted injury of any kind.’ ” Id. at 49 (citation omitted). The Eighth Circuit affirmed.
In International Underwriters, Inc. v. Home Ins. Co., 662 F.2d 1084 (4th Cir.1981) (non-ERISA case) the Court of Appeals for the Fourth Circuit, applying Virginia law, held that death as a result of autoerotic asphyxiation was not an accident within the meaning of an accidental death policy. The policy language at issue in that case was very similar to that involved herein. Id. at 1085. However, the policy also provided an exclusion for intentionally self-inflicted injuries. Id.
The district court concluded that the death resulted from the malfunctioning of the pul *1292 ley system used during the act and that the death was thus an accident. The Fourth Circuit reversed on the grounds that the district court had misinterpreted Virginia law with respect to the definition of accident. Id. The court after reviewing the relevant law including a prior Fourth Circuit case on the precise issue held:
Because decedent voluntarily placed his neck in the noose and tightened the same to the point where he lost consciousness, we think his death was the natural result of a voluntary act unaccompanied by anything unforeseen except death or injury. He is bound to have foreseen that death or serious bodily injury could have resulted when he voluntarily induced unconsciousness with a noose around his neck. We are thus of opinion that his death was not an accident under Virginia law and that judgment should be for the defendant.
Id. at 1087. Having determined that the death was not an accident the court found it unnecessary to address the policy exclusion for self-inflicted injuries. Id.
In Duvall v. Massachusetts Indem. & Life Ins. Co., 295 Ark. 412, 748 S.W.2d 650 (1988) the Arkansas Supreme Court discussed the meaning of the term “accident” in the context of an accidental death policy. The court recognized the difficulty courts have had in defining accident and accidental means noting that the difficulty in part stems from the differences in the medical and legal definition of accident.
The Arkansas Supreme Court in Duvall dealt with a policy that defined injury in substantially the same terms as those at issue herein. The court noting that the parties agreed that the language was not ambiguous stated that the language is fairly typical policy language. The court stated “[tjhere is no doubt that we should interpret the policy by construing the words in a plain and ordinary manner.” Id., 295 Ark. at 415, 748 S.W.2d 650 (citation omitted). Thereafter the court stated:
We have adopted the generally accepted definition of the term “accident” or “accidental,” which is “something happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected.”
Id., 295 Ark. at 415, 748 S.W.2d 650. Thereafter, the court quoted Justice Cardozo’s “Serbonian Bog” dissent in Landress v. Phoenix Mutual Life Ins. Co., 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934) for the proposition that no distinction should be drawn between accidental means and accidental results. In particular Justice Cardozo said “[i]f there was no accident in the means, there was none in the result, for the two were inseparable.” Landress, 291 U.S. at 501, 54 S.Ct. at 464. Justice Cardozo advocated that the question be left to the common understanding of man as revealed by common speech.
Many cases discuss the distinction between the accidental means approach and the-accidental result approach when used in connection with accidental death insurance policies. See e.g., Senkier v. Hartford Life & Acc. Ins. Co., 948 F.2d 1050 (7th Cir.1991). See generally 10 George J. Couch, Ronald A. Anderson & Mark S. Rhodes, Cyclopedia of Insurance Law, § 41.12 (Rev.Ed.1982). It has been said that “[djeath is almost always accidental in the sense of unintended by the deceased, so if an accidental result sufficed, coverage would be assured regardless of the cause of death.” Senkier, 948 F.2d at 1052.
An increasing number of jurisdictions are rejecting the distinction between accidental means and accidental result. See generally, Couch § 41.31. “The courts which have rejected the distinction between accidental means and accidental results have rested upon the analysis that it is illogical to purport to distinguish between the accidental character of the result and the means which produce it; that the distinction gives to “accidental means” a technical definition which is not in harmony with the understanding of the common man; and that the ambiguity found in the concept should be resolved against the insurer so as to permit coverage.” Id. Some courts have appeared to replace the means-end distinction, with a standard of foreseeability. See e.g., Patch v. Metropolitan Life Ins. Co., 733 F.2d 302 (4th Cir.1984) (non-ERISA).
The means-result distinction has been rejected in ERISA cases. See e.g., Wickman v. Northwestern Nat. Ins. Co., 908 F.2d 1077 *1293 (1st Cir.1990) (“[W]e elect to pursue a path for the federal common law which safely circumvents this ‘Serbonian Bog.’ ”), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1991).[2] Plaintiffs position is essentially that anything short of a specifically intended injury or death is an accident. In support plaintiff cites, inter alia, Connecticut General Life Ins. Co. v. Tommie, 619 S.W.2d 199 (Tex.Ct.App.1981).
In the Tommie case the decedent had died as a result of autoerotic asphyxiation. The accidental death benefit policy at issue paid if the insured received an accidental bodily injury. The policy also excluded coverage for any suicide or intentionally self-inflicted injury. The case was tried before a jury and the jury found the death to be accidental within the meaning of the policy and further found that it did not result from self-inflicted injury. Connecticut General appealed arguing that the jury verdict was against the great weight and preponderance of the evidence.
The court of appeals upheld the jury verdict noting that the verdict was not so against the great weight of the evidence as to be manifestly wrong. In so doing the court quoted the following from an earlier ease, Freeman v. Crown Life Ins. Co., 580 S.W.2d 897 (Tex.Civ.App.1979):
The mere fact that a person’s death may have occurred because of his negligence, even gross negligence, does not prevent that death from being an accident within the meaning of an accident insurance policy. It is only when the consequences of that act are so natural and probable as to be expected by any reasonable person that it can be said that the victim, in effect, intended the result and it was therefore not accidental.... More is required than a simple showing that the insured could have reasonably foreseen that injury or death might result.... [T]he insured must have acted in such a way that he should have reasonably known his actions would probably result in his death....
Tommie, 619 S.W.2d at 202 (citation omitted). The Freeman case dealt with the question of whether the death of a person who is killed in an automobile collision while driving under the influence of intoxicating liquor was accidental within the meaning of a group accidental death policy.
There had been expert testimony in the Tommie case that death was not the normal expected result of the autoerotic behavior although 40 some fatalities were reported in the United States each year. The expert also opined that death would not be reasonably expected under the circumstances. The testimony indicated that autoerotic behavior generally begins in young men during pubescence or shortly thereafter. The Tommie court noted that “[f]rom that testimony and all the other evidence, it can reasonably be concluded that, although the type of activity in which Mr. Tommie was engaged was foolish and fraught with substantial risk of injury or death, it was not of such a nature that the insured should have reasonably known that it would probably result in his death.” Id. On this basis the jury verdict was upheld.
While the parties have not cited, and the court’s own research has not revealed, any ERISA cases involving the precise issue before us, there are a number of ERISA cases interpreting phrases commonly used in accidental death and dismemberment benefit plans. One such case is the Wickman case cited supra. In Wickman the plaintiffs decedent had fallen from a bridge to his death. A witness had seen Wickman standing on the outside of the bridge’s guardrail, holding onto it with only one hand. The plan at issue defined accident as an unexpected, external, violent and sudden event. The policy also excluded benefits if the loss was caused by suicide or intentionally self-inflicted injury. The court noted there were three possible explanations for Wickman’s actions: ‘Wick-man intentionally projected himself over a dangerous visible void intending to (1) commit suicide, (2) seriously injure himself, or (3) having so positioned himself, fell inadvertently or mistakenly.” Wickman, 908 F.2d at 1083. Clearly the plan provided no coverage for the first two scenarios. It was the third scenario that caused the court difficulty.
*1294 The lower court ruled that Wickman did not lose his life as the result of an accident holding that “even if Wickman had no specific intent to injure or kill himself, ‘the harm that befell him was substantially certain to happen.’ ” Id. at 1083. As noted above, the First Circuit initially rejected adoption of the means-result distinction as part of the federal common law to be adopted in ERISA cases. The court then noted that defining the term “accident” has troubled federal judiciaries for years resulting in inconsistent results. “Much of the inconsistency in the case law defining and applying the definition of accident is traceable to the difficulty in giving substance to a concept which is largely intuitive.” Id. at 1087. It was noted that “[t]he common law has filled this gap, to a certain extent, by prescribing that these terms should be judged from the viewpoint of the insured.” Id.
The plaintiff in the Wickman case, as does the plaintiff in this case, argued that this common law premise means that unless Wickman “actually expected to die, essentially that he specifically intended to commit suicide, his death must be considered an accident.” The First Circuit rejected the strict application of the common law rule noting:
Such a strict definition from the perspective of the insured suffers from two imperfections, both of which make the test inappropriate in certain cases. The first difficulty comes in cases where an insured’s expectations, virtually synonymous with specific intent, are patently unreasonable .... To illustrate, there are several reported cases of people who have participated in games of Russian roulette not expecting or intending that they be killed, evidently entertaining a fanciful expectation that fate would inevitably favor them.... When a person plays a game like Russian roulette and is killed, the death, to use Cardozo’s test, would not be publicly regarded as an accident.... To allow recovery in such circumstances would “defeat the very purpose or underlying function of accidental life insurance.” The second difficulty with a test relying upon actual expectation is that actual expectation is often difficult, if not impossible, to determine. As one court has noted, “the subjective state of the mind of the insured cannot be generally known.” Generally, to make an accident solely dependent upon actual expectation compels courts and jurists to hypothesize and speculate. As in a case like this, where there are only vague clues as to what Paul Wick-man actually thought when he climbed over the guardrail, efforts to recreate a person’s actual expectations encounter the evident risks of error and frustration. It is an uncertain and too often a hopelessly blind search for the truth.
Id. at 1087-88 (citations omitted).
Despite the difficulty of looking to the expectation of the insured, the First Circuit concluded that the “reasonable expectations of the insured when the policy was purchased is the proper starting point for a determination of whether an injury was accidental under its terms.” Id. at 1088. The First Circuit advocated the following procedure:
If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable. This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance. If the fact-finder determines that the suppositions were unreasonable, then the injuries shall be deemed not accidental. The determination of what suppositions are unreasonable should be made from the perspective of the insured allowing the insured a great deal of latitude and taking into account the insured’s personal characteristics and experiences....
Finally, if the fact-finder, in attempting to ascertain the insured’s actual expectation, finds the evidence insufficient to accurately determine the insured’s subjective expectation, the fact-finder should then engage in an objective analysis of the insured’s expectations. In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *1295 highly likely to occur as a result of the insured’s intentional conduct.
Id. at 1088 (citations omitted).
One of the cases relied on by the First Circuit in Wickman was City of Carter Lake v. Aetna Cas. & Sur., 604 F.2d 1052 (8th Cir.1979). In that case involving a comprehensive general liability policy the court focused on whether a result was expected as a matter of probability. The court rejected the concept that the result was expected as the term is used because it was reasonably foreseeable. Id. at 1058. The court held that the word “expected”:
denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions. If the insured knew or should have know that there was a substantial probability that certain results would follow his acts or omission then there has not been an occurrence or accident as defined in this type of policy when such results actually come to pass.
Id. at 1059. A substantial probability existed when “[t]he indications [are] strong enough to alert a reasonably prudent man not only to the possibility of the results occurring but the indications also must be sufficient to forewarn him that the results are highly likely to occur.” Id. at n. 4. See also McLain v. Metropolitan Life Ins. Co., 820 F.Supp. 169 (D.N.J.1993) (ERISA case applying Wickman subjective/objective analysis). See also Couch § 41.25 (“Where the harm which befalls the insured is a reasonable or probable consequence of his volitional act, the harm, by definition, cannot be deemed accidental.”).
We agree with the Wickman court that the means-result distinction should not be adopted in ERISA cases. However, we find that the Wickman subjective/objective analysis sheds little light in an area of the law already unduly complicated by reference to various artificial distinctions. Rather, we believe it more appropriate to accord the term “accident” its natural meaning. The Eighth Circuit has directed us to accord the terms in ERISA plans with there ordinary and not specialized meanings.
In keeping with the directions of the Eighth Circuit and the teachings of Justice Cardozo in his dissent in Landress, we believe the common man on the street regards an accident as being something unintended, not according to the usual course of things, or not as expected. In this ease, it is undisputed that the insured did not expect to die as a result of performing the autoerotic act. Rather, the insured was merely involved in an act designed to enhance his sexual gratification. While it is true that this act was to use the words of the court in Tommie “foolish and fraught with substantial risk of injury or death,” we believe that in the common understanding of man Timothy Parker’s death would be regarded as accidental.
We find it inappropriate to adopt the standard of foreseeability advanced by the defendants. We hasten to say that we are not faced in this case with an exclusionary clause for injury resulting directly or indirectly from- an intentionally self-inflicted injury. The standard advanced by the defendants merges in the court’s view the policy definition of injury with typical policy language, not present herein, excluding loss caused by intentionally self-inflicted injury.

Conclusion.

For the reasons stated, we find the decision of the plan administrator is in error. We conclude that Timothy Parker’s death constituted an accident within the terms of his group accident insurance policy. A separate order in accordance herewith will be concurrently entered.

JUDGMENT

On this 12th day of April, 1994, the court finds for the reasons stated in a memorandum opinion of even date that the plaintiff should have and recover against the defendants judgment in the sum of $10,000.00 representing the accidental death benefits under a group policy of insurance covering the employees of Danaher Corporation. Said sum shall bear interest at the rate of 4.51% from the date of this order until paid.
Plaintiff is directed to file her motion for attorney’s fees within fourteen days in accordance with the provisions of Rule B-3 of *1296 the Local Rules for the Eastern and Western Districts of Arkansas.
IT IS SO ORDERED.

. Defendants earlier indicated their belief in a letter to the court that certain of the named defendants were not proper defendants under ERISA. As defendants have not raised this issue, the court makes no ruling in this respect.

. Wickman has been criticized on other grounds by the Eighth Circuit in Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 1994 U.S.App. LEXIS 6795 (8th Cir.1994). Specifically, the case was criticized because it considered the existence of an ERISA plan to be one of fact.