

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

NORTHROP GRUMMAN GUIDANCE
AND ELECTRONICS COMPANY, INC.,

        Appellant-Respondent,

v.

EMPLOYERS INSURANCE
COMPANY OF WAUSAU,

        Respondent-Appellant,

ONEBEACON AMERICA INSURANCE
COMPANY,

        Respondent-Appellant,

CERTAIN UNDERWRITERS AT
LLOYDS OF LONDON,

        Respondent-Appellant,

CERTAIN LONDON MARKET
INSURANCE COMPANIES,

        Respondent-Appellant.

WD82615 (Consolidated with WD82623 and WD82636)

Opinion filed:  August 4, 2020

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE J. DALE YOUNGS, JUDGE**

Division One:  Thomas H. Newton, Presiding Judge,
Mark D. Pfeiffer, Judge and Edward R. Ardini, Jr., Judge

This is an environmental insurance coverage action that arises out of Northrop Grumman Guidance and Electronics Company, Inc.'s ("Northrop") manufacturing operations at a facility in Springfield, Missouri. Northrop initiated this action in the Circuit Court of Jackson County against its insurers—Employers Insurance Company of Wausau ("Wausau"), OneBeacon America Insurance Company ("OneBeacon") and Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies ("London")—seeking coverage for contamination at the Springfield facility that resulted in property damage. At the conclusion of the fourteen-day jury trial, Northrop requested the jury award damages totaling over $10 million. The jury found in favor of Northrop on its coverage claim against Wausau and awarded Northrop $199,624 in damages. On Northrop's claims against OneBeacon and London, the jury found in favor of the insurers.

After trial, Northrop requested the trial court enter a judgment declaring Wausau's future defense and indemnity obligations to Northrop. The trial court entered its final judgment on the jury's verdicts and declared that Wausau was responsible for a portion of Northrop's future defense and indemnity costs. All parties appealed. For the reasons stated below, we affirm in part, reverse in part, and remand for entry of judgment consistent with this opinion.

**Factual and Procedural Background**

Beginning in the mid-1960s, Northrop manufactured printed circuit boards at its Springfield facility ("the Site").[1] Northrop was insured under primary and excess insurance policies that provided liability coverage for Northrop should its operations cause property damage to another. As relevant to this appeal, Northrop was insured under primary policies issued by

---

[1] Until 2001, the entity that operated the manufacturing facility at the Site was Litton Systems, Inc. ("Litton"). Northrop acquired Litton in 2001 and changed its name to Northrop in 2007. We use "Northrop" to refer both to Northrop and its corporate predecessor, Litton.

London (policy period of May 2, 1964 to May 2, 1967), OneBeacon[2] (policy period of May 2, 1967 to January 1, 1969), and Wausau (policy period of January 1, 1969 to April 1, 1971). The Wausau policy was initially slated to end on January 1, 1972, however Northrop cancelled the policy effective April 1, 1971 so that it could "self-insure"—i.e., forgo primary insurance coverage. Northrop was also insured under excess policies issued by London (policy periods of May 2, 1964 to February 2, 1966 and February 2, 1966 to February 2, 1969) and OneBeacon (policy period January 1, 1969 to July 3, 1969).[3] The relevant provisions of these policies will be discussed later in our analysis.

Northrop used the solvent trichloroethylene ("TCE") in manufacturing its circuit boards, and copper residue was generated during the manufacturing process. Northrop managed its sludge containing TCE and waste water containing dissolved TCE and copper in various ponds, pits, and lagoons at the Site, which the parties refer to as "Areas of Concern." The Areas of Concern at issue in this matter are the "Original Acid Pits," "Building Footprint," "Percolation Terrace/ A/B Lagoon," "New Acid Pit," and the "Sanitary Lagoon." The dates of operation of each Area of Concern varied.

In 1993, the Missouri Department of Natural Resources ("MDNR") asserted an administrative claim against Northrop, alleging that Northrop's manufacturing operations at the Site resulted in the release of hazardous substances that caused environmental contamination. In July 1993, Northrop entered into a consent agreement with MDNR requiring Northrop to investigate, develop, and implement an on-site remedial action plan (the "1993 Consent

---

[2] The OneBeacon policies were issued by a predecessor of OneBeacon.

[3] Although the policy period as stated on the OneBeacon excess policy was January 1, 1969 to January 1, 1972, for reasons not relevant to this appeal only the portion of the policy in effect between January 1, 1969 and July 3, 1969 was submitted to the jury.

Agreement"). The 1993 Consent Agreement was limited to the cleanup of impacted soil and groundwater within the boundaries of the Site, however it provided that if contamination were to be found beyond the Site's boundaries, the "Agreement may be modified or a new Agreement executed to assess the additional problem."

In December 2002, Northrop received correspondence from MDNR alleging that the Site was the source of contamination detected off-site in underground springs and at the Springfield Airport. In June and July of 2004, Northrop sent correspondence to Wausau, OneBeacon, and London tendering coverage for the 2002 claim. Wausau did not receive those letters, and did not receive notice of the claim until Northrop sent an additional letter in October 2004. In Wausau's response to the October 2004 letter, it took the position that it had no obligation to defend the 2002 claim until MDNR filed a lawsuit, and it requested additional information from Northrop regarding the claim. London also requested additional information from Northrop; on multiple occasions London requested Northrop provide documents and records in connection with the claim. Northrop did not receive a response from one OneBeacon regarding the tender.

In December 2010, the State of Missouri, on behalf of MDNR, filed an action against Northrop in federal court pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* (the "MDNR Lawsuit"). The State's complaint alleged that property adjoining the Site had been contaminated with hazardous substances attributable to Northrop's operations. The State sought responsive actions by Northrop and reimbursement of the State's response costs.

Contemporaneous with the filing of the lawsuit, Northrop and the State entered into a consent decree ("2010 Consent Decree") addressing remedial actions necessary both on- and off-site. Northrop did not admit any liability in the 2010 Consent Decree, but agreed to finance and

4

perform specified work to remediate the contamination. The 2010 Consent Decree "supersede[d] the 1993 Consent Agreement" and upon the effective date of the 2010 Consent Decree, the 1993 Consent Agreement terminated "with the exception of any outstanding obligation of [Northrop] to reimburse MDNR for past response costs incurred under the 1993 Consent Agreement." Northrop and the State sought the federal district court's approval of the 2010 Consent Decree; such approval was granted, and the district court executed and entered the agreement on June 1, 2011. Thereafter, the MDNR Lawsuit was dismissed.

In December 2010, Northrop tendered coverage for the MDNR lawsuit to Wausau, OneBeacon, and London. OneBeacon and London denied coverage on two bases: (1) the claims were released by Northrop in prior settlement agreements related to litigation involving different sites; and (2) Northrop failed to establish a loss occurred during the pendency of the policies. Wausau agreed to defend Northrop under a reservation of rights. Beginning in 2011, Wausau and Northrop engaged in settlement negotiations regarding Northrop's claim for coverage. The negotiations were ultimately unsuccessful, and despite Wausau agreeing to defend Northrop regarding the MDNR Lawsuit, Wausau did not pay any amounts to Northrop in connection with the MDNR Lawsuit.

In 2013, Northrop filed this coverage action asserting three counts against Wausau— breach of contract, vexatious refusal to pay, and declaratory judgment—and one count of declaratory relief each against OneBeacon and London. The insurers asserted various affirmative defenses to coverage, including that Northrop failed to give prompt notice of the claim and failed to cooperate with the insurers as required under their policies.

The parties filed pre-trial briefing regarding the issue of "allocation." Because this issue is central to this appeal, we briefly explain its legal underpinnings. "'[A]llocation' determines how

losses are divided amongst the insured and its insurers." *Nooter Corp. v. Allianz Underwriters Ins. Co.*, 536 S.W.3d 251, 264 (Mo. App. E.D. 2017). The issue is more complex where the claims involve allegations of continuous damage over a long period of time and where multiple policies are in effect during that period. *See id.* at 259, 264. "[T]wo leading methods of allocation have emerged to address this issue: the 'all sums' approach and the 'pro-rata' approach." *Id.* at 264. "The 'all sums' approach allows the policyholder to select a policy among the range of years triggered by the 'occurrence' at issue" and obtain the entire amount of its damages from that insurer up to the policy limits. *Id.* at 264 & n.15. The insurer may then "be able to recoup some or all of these funds from other insurers." *Id.* at 264. "Conversely, under the pro rata approach, damages are spread proportionately across the entire period during which the property damage takes place" and each insurer is responsible for its portion of the damages. *Id.* & n.14 (internal marks omitted).

Northrop requested that the trial court find the "all sums" allocation method applicable to the insurers' coverage obligations. The insurers asserted that the "pro rata" allocation method applied. After hearing argument, the trial court issued a pre-trial order ruling that "any liability of defendants herein shall be determined using the pro rata, and not the all sums, approach to allocation." The trial court found that "the pro rata allocation based on each defendant's time on the risk shall include allocation of a share to [Northrop] during the period in which its predecessor elected to be self-insured." Northrop moved for reconsideration of the trial court's order, which was denied. The trial court also denied Northrop's motion *in limine* to prevent the insurers from introducing evidence that Northrop elected to self-insure beginning April 1, 1971.

The parties proceeded to trial on October 30, 2017. Before opening statements, Northrop again requested the trial court reconsider its "pro rata" ruling and renewed its objections to the

admission of any "allocation" or "self-insurance" evidence. The trial court overruled Northrop's requests but granted a continuing objection to such evidence.

At trial, Northrop's expert—Dr. Delany—opined that releases of TCE and copper from various Areas of Concern caused groundwater contamination during each of the insurers' policy periods. He further testified that the groundwater contamination at the Site had commingled, such that its source could not be attributed to any particular Area of Concern.

The insurers presented the expert testimony of Robert Karls, who testified that there was a scientifically recognized methodology by which to determine to a reasonable degree of scientific certainty the relative percentage of groundwater contamination attributable to each Area of Concern on the Site. Relying on this methodology, which is called "Kriging," he testified that the majority of the groundwater pollution at the Site was attributable to the Original Acid Pits. The insurers also presented evidence that, as of March 20, 1971 (approximately ten days before Northrop began to self-insure), certain Areas of Concern, including the Original Acid Pits, were not yet constructed or operational at the Site.

The amount of damages Northrop sought from the insurers, and the basis therefore, was admitted into evidence as Exhibit 9A. This exhibit contained a chart, which summarized the damages sought from each insurer. As relevant to this appeal, the damages Northrop sought to recover from Wausau for Northrop's costs incurred from February 2010 to August 2017 were as follows:

| Soil Remediation Costs | | | | |
|---|---|---|---|---|
| OAP [Original Acid Pits] (includes electricity) | Building Footprint | A/B Lagoon & Perc Terrace | NAP [New Acid Pit] | Sanitary Lagoon |
| $5,439,474 | $402,195 | $113,127 | $3,565 | $369,799 |

| Groundwater Remediation Costs | | | | | |
|---|---|---|---|---|---|
| Springfield Aquifer | Ozark Aquifer | Groundwater O&M | Site Monitoring | Groundwater FS, Pilot Studies & Risk Assessment | Closure |
| $341,862 | $625,922 | $775,939 | $451,633 | $767,796 | |

| Misc Costs | | | |
|---|---|---|---|
| MDNR Oversight & Permits | General | Bryan Cave[4] | Fantastic Caverns |
| $108,581 | $624,030 | $199,624 | $74,636 |

These combined damages totaled $10,298,184.

The case was submitted to the jury in packages, each package of instructions corresponding to a separate insurer. For each insurer, the jury was instructed that its verdict must be for Northrop and against the insurer if the jury believed: (1) groundwater contamination by TCE or copper occurred at the Springfield Site at any time during the insurer's policy period; (2) groundwater contamination by TCE or copper caused Northrop to incur costs; and (3) the insurer did not pay Northrop for such costs, unless the jury believed Northrop was not entitled to recover based on one of the insurer's affirmative defenses. The jury was instructed on OneBeacon's and London's three affirmative defenses: late notice of claim, late notice of occurrences, and failure to cooperate.[5] Additionally, relating to Northrop's vexatious refusal to pay claim against Wausau, the jury was instructed that if it found in favor of Northrop, and it believed that Wausau refused to pay without reasonable cause or excuse, it was permitted to award Northrop a reasonable sum for attorney's fees in this case and an additional amount as a penalty not to exceed ten percent of the amount awarded on the Wausau policy.

---

[4] Bryan Cave is the law firm that represented Northrop in the MDNR Lawsuit.

[5] The jury was also instructed on Wausau's affirmative defenses: (1) Northrop expected or intended to cause the contamination; (2) late notice of claim; and (3) failure to cooperate.

The jury was given three verdict forms, one for each insurer. Each verdict form provided substantively as follows:

On the claim of plaintiff Northrop against the defendant [Insurer] under the [insurance policy at issue], we, the undersigned jurors find in favor of:

_____
(Plaintiff Northrop)                     or                     (Defendant [Insurer])

Note: Complete the following paragraph only if your verdict is in favor of plaintiff Northrop.

We, the undersigned jurors, assess the damages of plaintiff Northrop on the [Insurer] policy as follows:

| **Area of Concern** | **Amount** <br> **(stating the amount, or if none, write the word "none")** |
|---|---|
| Indivisible or Commingled (not allocable to any Area of Concern) | _____ |
| Original Acid Pits | _____ |
| Building Footprint | _____ |
| Percolation Terrace/ A/B Lagoon | _____ |
| New Acid Pit | _____ |
| Sanitary Lagoon | _____ |
| **Total Amount of Damages**: | _____ |

The verdict form pertaining to Northrop's claims against Wausau provided additionally that:

We, the undersigned jurors find that plaintiff Northrop shall be awarded a penalty of _____ % (amount not to exceed 10) of the amount awarded on the Wausau policy (stating the percentage amount or, if none, write the word, "none").

We, the undersigned jurors, further find that plaintiff Northrop _____ ("shall" or "shall not") be awarded a reasonable attorney fee in this case.

9

During closing arguments, counsel for Northrop asked the jury to find that the groundwater contamination was "commingled or indivisible" and to "put the groundwater costs on that blank."

The jury deliberated and returned with completed verdict forms; Verdict A pertained to Wausau, Verdict B to London, and Verdict C to OneBeacon. In Verdicts B and C, the jury found in favor of the insurers and the trial court accepted those verdicts. However, the trial court did not accept Verdict A. In Verdict A the jury found in favor of Northrop, but declined to award it any damages (the jury wrote "none" next to "Indivisible or Commingled" and each Area of Concern). Regarding the vexatious refusal claim, the jury determined that Northrop was to be awarded a reasonable attorney fee, but not a percentage of the amount awarded as a penalty against Wausau.

After conferring with counsel, the trial court read the following instruction to the jury: "The Court cannot accept your Verdict A as written because it is inconsistent to award zero dollars in damages pursuant to Instruction Numbers 7 and 11[6] and to award attorneys' fees pursuant to Instructions 12 and 13." The trial court directed the jury to resume deliberations. Thereafter, the jury returned with its "Second Form Verdict A," in which it again found in favor of Northrop. However, this time the jury determined that Northrop was entitled to $199,624 in damages relating to the "Sanitary Lagoon" and declined to award Northrop attorney's fees or a penalty on its vexatious refusal to pay claim. The trial court accepted this verdict.

---

[6] Instruction No. 7 was the verdict director. Instruction No. 11 provided that:

> If you find in favor of plaintiff Northrop and against Wausau under Instruction No. 7, then you must award plaintiff Northrop such sum as you believe will fairly and justly compensate plaintiff Northrop for any damages you believe plaintiff Northrop sustained as a direct result of the Missouri Department of Natural Resources' (MDNR) December 2002 claim of contamination of soil and groundwater by TCE or copper or both, including costs related to the contamination, attorneys' fees and other costs to defend against the claims by MDNR against Northrop, and other costs and expenses that Northrop has incurred in the past in connection with the 2002 MDNR claim, the 2010 Consent Decree or the MDNR Lawsuit.

10

Northrop filed a Post-Verdict Motion for Declaratory Judgment Against Wausau, seeking a declaration that Wausau had a continuing obligation to defend Northrop against the 2010 Consent Decree entered in the MDNR Lawsuit and to cover Northrop's future liability to pay all cleanup costs under the 2010 Consent Decree. Northrop also sought reconsideration of the trial court's ruling that the "pro rata" allocation method applied.

On November 6, 2018, the trial court entered Judgment granting Northrop's motion in part. The trial court determined that Wausau was obligated to pay future defense costs in connection with the 2010 Consent Decree and MDNR Lawsuit, "although that duty extends only to those related to contamination in the Sanitary Lagoon," and "that these future 'defense costs' should include not only attorneys' fees and other traditional defense costs, but also site investigation costs and related consultant fees." Additionally, the trial court found that Northrop was "also entitled to a declaration that Wausau is obligated to indemnify plaintiff for future cleanup costs and related indemnity costs and expenses in connection with the 2010 Consent Decree and the MDNR lawsuit. Similarly, this obligation is limited to contamination in the Sanitary Lagoon."

The trial court also reconsidered its allocation ruling, "vacate[d] its previous order on this subject, and determine[d] an 'all sums' method of allocation governs Wausau's coverage obligations to plaintiff." The trial court thus determined that "Wausau is liable for all of the past damages awarded by the jury, and is obligated to indemnify plaintiff for all future sums related to contamination of the Sanitary Lagoon which the Court declares Wausau responsible for herein."

The parties filed post-judgment motions and the trial court heard argument thereon. On February 20, 2019, the trial court entered its order denying all post-judgment motions.[7] This appeal

---

[7] These motions included Northrop's motion for new trial and JNOV relief as to Wausau, Northrop's alternative motion to amend the judgment and motion for additur as to Wausau, Northrop's motion for new trial and JNOV relief as to OneBeacon and London, Wausau's motion to reconsider and/or amend the November 6, 2018 judgment, and

11

followed. Northrop raises nine points on appeal, Wausau raises three, and OneBeacon and London jointly raise one. The points can essentially be grouped into three categories.

The first category involves the trial court's rulings regarding the proper allocation method, and the effect of those rulings on the trial. In Wausau's first point and OneBeacon and London's sole point, they assert the trial court erred in ultimately ruling that the "all sums" method of allocation applied to the award of damages. In Northrop's first point, it asserts that it is entitled to a new trial because the trial court erroneously conducted a "pro rata" trial, which "confused the issues for the jury and adversely affected the verdicts." In its second and third points, Northrop argues the trial court erred in admitting certain evidence at trial which was "irrelevant and inadmissible" under the "all sums" allocation approach.

The second category of claims raised on appeal involves the trial court's declaratory judgment ruling. Northrop and Wausau each assert error in the trial court's ruling that Wausau is required to pay a limited portion of Northrop's future indemnity costs; Northrop argues Wausau should be required to pay all indemnity costs (Northrop's Point VIII), while Wausau argues it should not be required to pay any (Wausau's Point II). The parties raises similar claims of error relating to the trial court's ruling that Wausau must pay a limited portion of Northrop's future defense costs; Northrop argues Wausau should be required to pay all defense costs (Northrop's Point IX), while Wausau argues it should not be obligated to pay any future defense costs (Wausau's Point III).

The third and final category of claims raised on appeal involves OneBeacon's and London's affirmative defenses. In Northrop's remaining points—Points IV through VII—

London and OneBeacon's motions seeking JNOV relief or, alternatively, amendment of the trial court's November 6, 2018 judgment.

12

Northrop argues that the trial court erred in submitting to the jury OneBeacon's and London's affirmative defenses of "late notice of claim" and "failure to cooperate."

We will address these points in the order just described.

## Category I - Allocation

*Standards of Review*

Addressing the points that involve the issue of allocation will require us to employ the following standards of review.

"The proper interpretation of an insurance policy is a question of law that appellate courts review *de novo*[.]" *Nooter Corp.*, 536 S.W.3d at 262 (citing *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 616 (Mo. banc 2017)).

"We review the denial of a motion for new trial for abuse of discretion." *Beverly v. Hudak*, 545 S.W.3d 864, 869 (Mo. App. W.D. 2018). "An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances before the court at the time and is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration." *Id.* "To succeed on a motion for new trial, the moving party must establish that trial court or misconduct of the prevailing party incited prejudice in the jury." *Id.* (internal marks omitted). "We will reverse the trial court's denial of a motion for new trial only if we find a substantial or glaring injustice." *Id.* (internal marks omitted).

Similarly, we review the trial court's admission or exclusion of evidence for abuse of discretion. *See Ostermeier v. Prime Props. Invs. Inc.*, 589 S.W.3d 1, 10 (Mo. App. W.D. 2019) ("On appellate review, the issue is not whether the evidence was admissible or should have been excluded, it is whether the trial court abused its discretion in admitting or excluding the evidence."). A trial court has broad discretion in determining the admission of evidence, and if

13

"reasonable persons may differ as to the propriety of an action taken by the trial court, then there was no abuse of discretion." *Id.* "Even if we find an abuse of discretion, we will reverse only if the prejudice resulting from the improper admission of evidence is outcome-determinative," *id.* (internal marks omitted), as in, the error "affect[ed] the result or the outcome of the case," *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 768 n.12 (Mo. banc 2011).

*(A) The trial court did not err in
applying the "all sums" method of allocation*

In its first point, Wausau asserts the "trial court erred in its post-verdict judgment applying the 'all sums' method of allocation" because "the language of the Wausau policy mandates application of a 'pro-rata' post-verdict method of allocation."[8] We disagree.

In Missouri, the determination as to which allocation method applies depends on the language of the particular policy at issue, and must be made on a case-by-case basis.[9] *See Nooter Corp.*, 536 S.W.3d at 265 & n.16; *Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London*, 400 S.W.3d 463, 474 n.8 (Mo. App. E.D. 2013). Thus, our analysis begins with the relevant language of the Wausau policy. The "Coverage" section in the Wausau policy provides:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

---

[8] In their sole point on appeal, OneBeacon and London also assert the trial court erred in finding the "all sums" method applied to the award of damages. However, OneBeacon and London "do not seek to disturb the Judgment as it relates to them" and "[o]nly in the event this Court reverses the judgment, [do they] raise this point in order to preserve their argument that any allocation method that is to be applied to them should be 'pro rata.'" Because we are not reversing the trial court's judgment as it relates to them, we need not resolve OneBeacon and London's precautionary claim of error.

[9] As we previously explained in the background section of this opinion, "'allocation' determines how losses are divided amongst the insured and its insurers" and there are two leading methods to address this issue: the "all sums" approach and the "pro rata" approach. *Nooter Corp.*, 536 S.W.3d at 264. The "all sums" approach generally favors the policyholder because under this method "each triggered insurer is liable for the insured's entire loss, even though the injury giving rise to the liability may have begun before, and continued after, the insurer's policy period. One insurer pays the entire loss and then may seek contribution from other triggered insurers[.]" *Id.* at 265 n.15. Under the "pro rata" approach, liability is generally apportioned among all insurers "based on dividing the aggregate policy limits by the portion of the occurrence covered by the policy period." *Id.* at 264 n.14.

14

Coverage A: Personal Injury or

Coverage B: Property Damage

to which this policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury or property damage[.]

The "Policy Period" section of the Wausau policy states: "This insurance applies only to personal injury or property damage which occurs during the policy period."

"[T]wo categories of language play the most prominent roles in addressing the allocation issue"—the "all sums" language and "language limiting losses or occurrences to a particular policy period." *Nooter Corp.*, 536 S.W.3d at 266. In *Nooter*, the Eastern District of this Court determined which method of allocation applied to several policies. The Eastern District concluded that the "all sums" method applied based on the language of the policies, which each had "(1) some type of 'all sums' language ('all sums,' 'the sum,' 'the sums,' or 'the total sum') and (2) language limiting losses or occurrences to a particular policy period ('during the [policy] period,' 'while this policy is in force,' 'occurring during the policy period,' 'coming within the terms and limits of this [policy],' etc.)." *Id.* (internal marks in the original). Relying on Missouri precedent, the Eastern District concluded that the "all sums" language—the language that generally required the insurer to pay "all sums" that the insured becomes obliged to pay—was not limited by the "during the policy" language in these policies. *See id.* at 266-67 (citing *Doe Run Res. Corp.*, 400 S.W.3d at 475).

The Wausau policy at issue here contains language similar to that analyzed in *Nooter*. Wausau agreed to "pay on behalf of [Northrop] ***all sums*** which [Northrop] shall become legally obligated to pay as damages because of . . . Property Damage to which this policy applies, caused by an occurrence[.]" Wausau's promise to pay "all sums" that Northrop becomes legally obligated

15

to pay is not limited by the "Policy Period" language in the policy. *See Nooter Corp.*, 536 S.W.3d at 266-67; *Doe Run Res. Corp.*, 400 S.W.3d at 475; *see also Zurich Am. Ins. Co. v. Ins. Co. of N. Am.*, No. 4:14-CV-1112, 2018 WL 2117662, at *2, 4-6 (E.D. Mo. May 8, 2018) (analyzing policy language almost identical to the language at issue here and determining the "all sums" method of allocation applied). Wausau's attempts to distinguish its policy language from that in *Doe Run* and *Nooter* and to argue its policy language requires a different result are unavailing, as the insurers in *Nooter* raised similar arguments, which were rejected. *See Nooter Corp.*, 536 S.W.3d at 266-67.

For these reasons, the trial court did not err in applying the "all sums" allocation method. Wausau's first point *is denied.*

### (B) The trial court's initial "pro rata" ruling did not warrant a new trial

In its first point, Northrop asserts that the "trial court erred in denying Northrop's motion for a new trial because the trial court's acknowledged error in conducting trial based on a 'pro rata' approach severely prejudiced Northrop's rights to a trial based on 'all sums' in that a 'pro rata' trial confused the issues for the jury and adversely affected the verdicts." We disagree.

Northrop has failed to demonstrate how the trial court's initial "pro rata" ruling resulted in prejudice sufficient to warrant a new trial. The allocation of damages among triggered insurance policies—whether using the "pro rata" or "all sums" method—does not occur until liability is established. *See Cont'l Cas. Co. v. Indian Head Indus., Inc.*, No. 05-73918, 2012 WL 1229944, at *5 (E.D. Mich. Apr. 12, 2012) ("The allocation determination is made at the time the underlying suits are resolved by way of settlement or a finding of liability."). Thus, here, the allocation method applied by the trial court was irrelevant to the issues before the jury; allocation was a post-trial

issue to be resolved by the trial court only *if* the jury determined an insurer was liable for damages, a fact Northrop has acknowledged throughout this litigation.[10]

Nonetheless, Northrop argues that the trial court's initial "pro rata" ruling infected the trial by "confus[ing] the issues for the jury and adversely affect[ing] the verdicts." But Northrop has failed to demonstrate how the jury was confused or misled by the trial court's ruling. Other than making a broad, general prejudice argument, Northrop relies on the trial court's alleged erroneous admission of two types of evidence—"evidence of self-insurance and allocation"[11]—which Northrop asserts were irrelevant under the "all sums" approach, thereby resulting in prejudice warranting a new trial. However, the alleged erroneous admission of these two types of evidence are the specific subjects of Points II and III of Northrop's appeal, and, as explained in further detail in our discussion of those points, the trial court did not abuse its discretion in admitting this evidence. Thus, we find that Northrop failed to demonstrate a trial court error occurred that "incited prejudice in the jury" or resulted in a "substantial or glaring injustice," thereby warranting a new trial. *See Hudak*, 545 S.W.3d at 869.

Northrop's Point I is denied.

*(C) The trial court did not abuse its
discretion in admitting Karls's testimony*

In its second point, Northrop asserts the "trial court erred in admitting evidence from defendants' expert, Robert Karls, regarding allocation of groundwater contamination from various areas of concern at the Site" because such "allocation" evidence is irrelevant and inadmissible

---

[10] For example, in its motion *in limine* filed September 27, 2017, Northrop argued that regardless of which method of allocation applies, "the jury is not going to decide allocation of damages. Allocation is an issue that would need to be addressed by the Court in post-trial proceedings."

[11] As explained more fully in our discussion of Northrop's second point, what Northrop characterizes as "allocation" evidence is actually "divisibility" evidence, i.e., evidence which tends to show that the groundwater contamination was divisible and attributable to different Areas of Concern, as opposed to commingled and indivisible.

17

under the "all sums" method of allocation. Northrop's argument, however, rests on a mischaracterization of the testimony provided by Karls; this evidence was not "allocation" evidence, but rather permissible "divisibility" evidence presented to show that no covered property damage occurred during the insurers' policy periods. *See State of California v. Allstate Ins. Co.*, 201 P.3d 1147, 1166-67 (Cal. 2009).

In *Allstate Insurance Company*, the insured (the State of California) sought coverage from its insurers for property damage liability imposed in a federal lawsuit based on the discharge of hazardous waste. 201 P.3d at 1152. The issue arose as to whether some of the remediation costs were attributable to events that were not covered under the policies (only "sudden and accidental" events were covered). *Id.* at 1165-66. The California Supreme Court determined that summary judgment was improper because there were triable issues as to whether the damages were indivisible. *Id.* at 1166, 1168. The court found that the insured was entitled to prove its damages were indivisible, and thus the insurers were required to pay for damages resulting from covered and noncovered events. *Id.* at 1167. The court found that "[t]he insurer, of course, may counter the insured's evidence of indivisibility with its own evidence that the damages are divisible and that only a limited portion of them resulted from covered events." *Id.*

Here, Northrop presented evidence tending to show that the groundwater contamination at the Site was commingled and indivisible—as in the contamination could not be attributed to any particular Area of Concern—and that the contamination occurred during the insurers' policy periods. In rebuttal, the insurers were entitled to present evidence tending to show that the contamination could be attributed to specific Areas of Concern—i.e., the contamination was divisible—and that those Areas of Concern did not begin operation until after their policy periods ended. *See Allstate Ins. Co.*, 201 P.3d at 1167. In other words, the insurers were entitled to present

18

evidence that no covered property damage occurred during their policy periods. Karls's testimony regarding the divisibility of groundwater contamination was relevant to *this* issue—the issue of whether the insurers were liable in the first instance—not the issue of allocation of damages. As previously discussed, allocation of damages only comes in to play once liability is established.

For these reasons, we find that the trial court did not abuse its discretion in admitting Karls's testimony. Northrop's Point II is denied.

*(D) The trial court did not abuse its discretion*
*in admitting evidence of Northrop's self-insurance*

In Northrop's third point, it argues that the "trial court erred in admitting evidence about Northrop's self-insurance program and defendants' contentions they only insured a portion of the loss and most of it occurred after their policies expired" because such evidence is irrelevant and inadmissible under the "all sums" method of allocation. We disagree, and find that such evidence was relevant and admissible regardless which method of allocation applied.

As explained above, the insurers were entitled to present evidence tending to show that the contamination did not occur until after their policy periods expired, which included the time period in which Northrop was self-insured. Evidence that Northrop elected to self-insure was especially relevant to Wausau, as Northrop cancelled the Wausau policy prior to its end date in order to self-insure. The Wausau policy was admitted into evidence, and that policy expressly stated the policy end date was January 1, 1972. It was crucial that the jury be made aware of the actual end date of the policy—April 1, 1971—so that the jury could determine whether contamination occurred during Wausau's policy period. We cannot say that allowing Wausau to present evidence as to the context of that early termination was an abuse of discretion warranting a new trial.[12] This is

---

[12] OneBeacon and London did not present evidence that Northrop elected to self-insure; the evidence was presented solely by Wausau.

especially true given that Northrop asserted a vexatious refusal to pay claim against Wausau, implicating the nature of the relationship between the two parties. The vexatious refusal claim provided an additional basis for finding relevant the evidence that Northrop terminated the Wausau policy prior to its end date in order to self-insure, rather than due to any misconduct on the part of Wausau.

The trial court did not abuse its discretion in admitting evidence relating to Northrop's decision to self-insure. Northrop's Point III is denied.

## Category 2 - Declaratory Judgment

*Standard of Review*

"The standard of review in a declaratory judgment case is the same as in any other court-tried case." *City of Kansas City v. Chastain*, 420 S.W.3d 550, 554 (Mo. banc 2014). "The judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "[I]nterpretation of an insurance policy is a question of law, and the trial court receives no deference where resolution of the controversy is a question of law." *Nooter Corp.*, 536 S.W.3d at 263. Both the trial court and this Court are bound by the jury's findings of fact. *Shelter Mut. Ins. Co. v. Briggs*, 799 S.W.2d 846, 853 (Mo. App. W.D. 1990).

*(A) The trial court did not err in limiting*
*Wausau's future indemnity obligation*

In Northrop's eighth point, it asserts that the "trial court erred by declaring that Wausau's future indemnity obligation does not include payment for all of Northrop's liability for the 2010 Consent Decree and MDNR lawsuit up to policy limits." We disagree, and find the trial court did not err in limiting Wausau's future indemnity obligation to the Sanitary Lagoon.

20

Northrop's claim of error, again, rests on the doctrine of allocation. Northrop argues that "the jury's verdict establishes that some groundwater contamination occurred at the Site during Wausau's policy period," and thus, pursuant to the "all sums" allocation approach, "Wausau must pay all sums for Northrop's liability up to policy limits." However, Northrop's argument misunderstands the nature and function of allocation.

Prior to allocation, there must be a determination of liability, i.e., a determination that a covered event occurred for which an insurer or insurers are liable. Once liability is determined, allocation answers the question which insurer or insurers pays the damages to the insured and in what proportion. *See Nooter Corp.*, 536 S.W.3d at 264-65. Allocation does not create legal liability (i.e., impose coverage) for divisible property damage where the fact-finder determined none existed. Here, the jury was asked to decide if any insurer was liable for property damage that resulted from "indivisible or commingled" contamination or contamination that occurred at five different Areas of Concern. The jury found that only Wausau was liable and only for the property damage resulting from contamination at the Sanitary Lagoon; the jury specifically *refused to find* that the property damage in this case was indivisible. Wausau is not obligated to pay for costs incurred by Northrop relating to other Areas of Concern that the jury found were not covered occurrences for which any insurer is liable. *See Allstate Ins. Co.*, 201 P.3d at 1165 (If "only a provably distinct amount of the remediation costs were attributable to [covered occurrences], only *that amount* would constitute sums which the Insured[13] became obligated to pay for damages

---

[13] The insurance claims at issue in *Allstate Insurance Co.*, like the insurance claims here, were third-party liability insurance claims. *See* 201 P.3d at 1163. In third-party insurance policies, the insurer provides coverage to the insured for the insured's own negligence. *Garvey v. State Farm Fire & Cas. Co.*, 770 P.2d 704, 710 (Cal. 1989). Thus, "[i]f the insured is seeking coverage against liability of the insured to another, the claim is third party in nature." *Id.* at 705 n.2 (emphasis omitted). Hence the reference in the above-cited quotation that the "Insured" was obligated to pay for damages.

because of property damage from [covered occurrences]." (emphasis in original) (internal marks omitted)).

Northrop is correct that "[u]nder 'all sums,' an insurer is jointly and severally liable for all *legal liability* where, as here, some property damage occurred during the insurer's policy period[.]" (emphasis added). Legal liability was determined by the jury and found to be limited to the Sanitary Lagoon. Thus, Wausau is jointly and severally liable for all sums incurred by Northrop associated with the Sanitary Lagoon—the only legal liability found by the jury—and the trial court did not err in limiting Wausau's future indemnity obligation to the Sanitary Lagoon. Northrop's Point VIII is denied.

*(B) The trial court did not err in*
*awarding Northrop future indemnity costs*

In Wausau's second point, it asserts that the trial court erred in granting Northrop declaratory relief requiring Wausau to pay future costs incurred by Northrop in connection with contamination in the Sanitary Lagoon because such ruling "conflicts with the jury's findings in that the jury concluded that Wausau has no obligation to pay any of Northrop's groundwater remediation (indemnity) costs, and therefore there is no basis to require Wausau to pay Northrop's future costs." We disagree with Wausau's characterization of the jury's findings.

Wausau contends that the jury's award of $199,624 in damages was for Northrop's past legal defense costs limited to the Sanitary Lagoon, noting that this amount was "the exact amount of defense costs for the Bryan Cave law firm that Northrop itemized on its claim for damages contained in Exhibit 9A." Thus, Wausau characterizes the jury's verdict as "awarding only *past legal defense costs* for a single Area of Concern," and argues that the trial court was not permitted to "override the jury's verdict and reinstate an entire category of damages, i.e., groundwater remediation costs, rejected by the jury." (emphasis in original).

22

But to accept Wausau's characterization of the jury's damage award as past legal defense costs, we would have to look outside the verdict and construe the jury's findings to comport to evidence presented by one of the parties. "A court may not speculate as to what the jury meant," and "[t]he parties are entitled to the unconditional judgment of the jury rather than the court's interpretation of its findings." *Kan. City Power & Light Co. v. Bibb & Assocs., Inc.*, 197 S.W.3d 147, 155 (Mo. App. W.D. 2006); *see also Blackman v. Botsch*, 281 S.W.2d 532, 536 (Mo. App. 1955) ("We do not possess the insight of the Master Clocksmith which would enable us to peer into the works of the jury's collective mind and say which wheels were turning when the verdict was struck."); *cf. Ralston Purina Co. v. Kennedy*, 347 S.W.2d 462, 467 (Mo. App. 1961) (finding the verdict ambiguous and unable to support the judgment entered thereon, and rejecting the defendants' argument that the verdict could be logically construed by looking outside the verdict form: "If we indulge in speculation, this may have been the jury's intention" but "[w]e cannot reach any such conclusion nor arrive at any such judgment from a reading and study of the verdict[.]"). Thus, we will not speculate that the jury intended Northrop to be entitled solely to legal fees relating to the Sanitary Lagoon and not damages for remediation costs, as a review of the Second Form Verdict A reveals no such finding, and it would be improper for us to look outside the verdict to interpret the jury's intent in awarding damages.

The trial court's declaration that Wausau is required to pay Northrop's future indemnity costs related to the Sanitary Lagoon did not conflict with the jury's verdict. Therefore, we find the trial court did not err as asserted in Wausau's Point II, and this Point is denied.

*(C) The trial court erred in awarding Northrop future defense costs*

In this section we resolve Northrop's ninth point and Wausau's third point, which both involve the trial court's ruling that Wausau is obligated to pay some of Northrop's future defense

costs relating to the 2010 Consent Decree and MDNR Lawsuit. Northrop asserts the "trial court erred by declaring that Wausau's duty to pay future defense costs was limited only to cost related to the Sanitary Lagoon" because "under Missouri law an insurer having a duty to defend must provide a complete defense to a suit." Wausau asserts the trial court erred in requiring Wausau to pay any future defense costs because "the court-approved 2010 Consent Decree constitutes a final judgment and settlement of the environmental claims against Northrop" and "the subsequent actions undertaken by Northrop to remediate the environmental contamination are costs to comply with the terms of the Consent Decree and therefore are not 'defense' costs." We agree with Wausau.

In its post-verdict judgment, the trial court declared that Wausau "has a duty to defend [Northrop] in connection with the 2010 Consent Decree and the MDNR lawsuit" and thus is obligated to pay future defense costs related to the Sanitary Lagoon, including "attorneys' fees and other traditional defense costs," as well as "site investigation costs and related consultant fees." However, we find there is no longer an underlying lawsuit that gives rise to Wausau's duty to defend: The 2010 Consent Decree represented the "final judgment and settlement between and among the State of Missouri and [Northrop]," and after entry of that Consent Decree, the MDNR Lawsuit was dismissed.[14]

"When a particular claim is settled, it is no longer being defended." *Teck Metals, Ltd. v. Certain Underwriter's at Lloyd's, London*, 735 F. Supp. 2d 1260, 1267 (E.D. Wash. 2010). In *Teck*

---

[14] Specifically, the 2010 Consent Decree provided:

**XXXI. FINAL JUDGMENT AND SETTLEMENT**

114. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment and settlement between and among the State of Missouri and Settling Defendant [Northrop]. The Court finds that there is no just reason for delay and therefore enters this judgment and settlement as a final judgment under Fed. R. Civ. P. 54.

*Metals*, the court held that remedial site investigation costs incurred pursuant to a settlement agreement with the Environmental Protection Agency were not incurred in defense of a claim because the claim had been settled. *Id.* Such investigative costs did not represent "costs incurred in defense of a claim," but rather "costs to be paid as settlement of a claim." *Id.* ("At that stage, it is no longer the investigation of a claim, but the settlement of a claim.").

Similarly, in *Aerojet-General Corporation v. Transport Indemnity Co.*, the California Supreme Court held that an "insured's site investigation expenses constitute defense costs that the insurer must incur in fulfilling its duty to defend if, and only if . . . the site investigation [is] conducted within the temporal limits of the insurer's duty to defend, i.e., between tender of the defense **and conclusion of the action"** and "the site investigation [is] a reasonable and necessary effort to avoid or at least minimize liability." 948 P.2d 909, 922 (Cal. 1997) (emphasis added).[15] "By contrast, if and to the extent that the site investigation is not conducted within the temporal limits of the insurer's duty to defend or does not amount to a reasonable and necessary effort to avoid or at least minimize liability, the related site investigation expenses cannot even possibly be defense costs that the insurer must incur in fulfilling its duty to defend." *Id.* In further explaining when site investigation costs may be deemed defense costs, the court noted that "[s]ite investigation expenses may be defense costs because they may be reasonable and necessary to avoid or at least minimize liability," however "[s]ettlement costs cannot be defense costs because, instead, they resolve liability." *Id.* at 926.

Consistent with *Aerojet-General* and *Teck Metals*, we find that future site investigation costs, consultant fees, attorney's fees, and other such costs incurred by Northrop related to the

---

[15] The trial court relied on this case in support of its decision to include investigation costs and consultant fees as "defense costs."

2010 Consent Decree and MDNR Lawsuit are not "defense costs," as they would not be paid in defense of a lawsuit, but rather as part of the settlement of a lawsuit. Because such costs would arise outside of Wausau's temporal limits of its duty to defend—i.e., after the conclusion of the action—Wausau has no "duty-to-defend" obligation to pay them on behalf of Northrop. This finding is consistent with the Wausau policy language, which limits Wausau's duty to defend to "suits"[16]: once Northrop and the State settled the MDNR Lawsuit and dismissed the action, there was no longer a lawsuit for Wausau to defend. *Cf. Teck Metals*, 735 F. Supp. 2d at 1267 ("When a particular claim is settled, it is no longer being defended.").

For these reasons, we find that the trial court erred in declaring Wausau was obligated to pay Northrop's future defense costs associated with the 2010 Consent Decree and MDNR Lawsuit.[17] Wausau's Point III is granted and Northrop's Point IX is denied.

## Category III - Affirmative Defenses

The insurers asserted various affirmative defenses in response to Northrop's claims in this action. Northrop filed motions for directed verdict as to the insurers' affirmative defenses at the close of the insurers' evidence as well as at the close of all evidence. The trial court heard argument

---

[16] The Wausau policy provided that Wausau "shall have the right and duty to defend any *suit* against the insured seeking damages on account of such personal injury or property damage[.]" (emphasis added).

[17] While we find Wausau is not obligated to pay future defense costs, we do not disturb the trial court's ruling that "Wausau is obligated to indemnify [Northrop] for future cleanup costs and related indemnity costs and expenses in connection with the 2010 Consent Decree and the MDNR lawsuit." And although we find that the site investigation costs and related consultant fees may not be properly deemed "defense costs" because the MDNR Lawsuit has settled and been dismissed, we note that Wausau has conceded in both its initial brief and reply brief that such costs would be deemed indemnity costs. *See, e.g.*, Wausau initial brief at 45 ("Northrop's argument that Wausau should be required to pay future defense costs also fails because Northrop's legal liability for remediating environmental contamination at the Site has been established, and therefore any future costs incurred by Northrop will be indemnity costs, not defense costs."); *id.* at 47 ("Even if Northrop is still incurring site 'investigation' expenses . . . those costs are part of the liability incurred by Northrop under the 2010 Final Judgment and Settlement."); Wausau reply brief at 16 ("As noted in Wausau's initial brief, three Washington courts that have ruled on this issue conclud[ed] that costs incurred pursuant to [consent decrees] are indemnity costs."). *See, e.g.*, *Travelers Indem. Co. v. City of Richland*, No. 4:17-CV-5200, 2018 WL 4760526, at * 4 (E.D. Wash. May 30, 2018) (although site investigation costs were not "defense costs," they were properly characterized as "damages" that were payable as indemnity costs).

26

on Northrop's motions and granted them as to the following defenses: oral settlement, prior release, unclean hands, "owned property" exclusion, and the "willful and unlawful" policy exclusion. The trial court denied the motions as to the affirmative defenses of late notice and failure to cooperate, and these defenses were submitted to the jury.[18] The submission of the defenses of "late notice of claim" and "failure to cooperate" relating to OneBeacon and London are the subject of Northrop's remaining four points on appeal.[19]

*Standards of Review*

"A defendant is entitled to a jury instruction on any theory that the evidence and the reasonable inferences therefrom, viewed in the light most favorable to the submission of the instruction, tend to establish." *Hopfer v. Neenah Foundry Co.*, 477 S.W.3d 116, 126-27 (Mo. App. E.D. 2015) (reviewing whether the defendant was entitled to submit its affirmative defense to the jury); *see also Gill Constr., Inc. v. 18th & Vine Auth.*, 157 S.W.3d 699, 712 (Mo. App. W.D. 2004) (in reviewing the denial of a motion for directed verdict, "[t]he evidence is viewed in the light most favorable to the non-moving party, affording the non-moving party all reasonable inferences from the evidence and disregarding the moving party's evidence that contradicts the non-moving party's claims"). A defendant has a right to submit its defense to the jury if there is any fact or circumstance in the evidence, "be it direct or circumstantial, and irrespective of whether it comes from defendant or plaintiff," tending to establish the defense. *See Tomlin v. Alford*, 351 S.W.2d 705, 711 (Mo. 1961); *see also Fogarty v. J.C. Penney Co., Inc.*, 736 S.W.2d 443, 446 (Mo. App.

---

[18] Northrop also asserted in its Motion for New Trial and JNOV Relief as to OneBeacon and London that the trial court erred in submitting these defenses to the jury, thereby entitling Northrop to a new trial. That motion was denied.

[19] As to OneBeacon and London, three affirmative defenses were submitted to the jury: late notice of occurrences, late notice of claim, and failure to cooperate. Northrop has not appealed the submission of the "late notice of occurrences" defense.

W.D. 1987) (a defendant is entitled to submit its defense "if there was any construction of the evidence which supported it").

"Whether a jury was instructed properly is a question of law that this Court reviews *de novo*." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 766 (Mo. banc 2010). "The test is whether the instruction follows the substantive law and can be readily understood by the jury." *Alhalabi v. Mo. Dep't of Natural Res.*, 300 S.W.3d 518, 527 (Mo. App. E.D. 2009). "A proper instruction submits, not evidentiary details, but only the ultimate facts, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." *Id*. We reverse based on an instructional error only if "the party challenging the instruction shows that the instruction misdirected, misled, or confused the jury, and there is a substantial indication of prejudice." *Id.*

*(A) Northrop failed to preserve*
*the claim of error raised in Point IV*

Northrop's fourth point relates to the submissibility of OneBeacon's "failure to cooperate" affirmative defense, in which OneBeacon asserted that Northrop's failure to cooperate with OneBeacon precluded coverage of Northrop's claim. Specifically, Northrop asserts that the "trial court erred in submitting OneBeacon's defense of failure to cooperate, and in denying Northrop's motions for directed verdict, JNOV relief and new trial thereon, because breach of cooperation is only a valid defense if the insurer presents evidence it took steps to secure the insured's cooperation, in that it is undisputed OneBeacon never sought Northrop's cooperation before denying the claim on other grounds so the defense fails as a matter of law." We decline to review this point, however, because it was not preserved for appeal.

Northrop failed to raise the specific argument it asserts in Point IV in its motions for directed verdict and Motion for New Trial and JNOV Relief, as required to preserve its claim on

appeal. Rather, Northrop asserted in these motions that the affirmative defense should not have been submitted to the jury because there was a lack of evidence to support other elements of the defense, namely that Northrop materially breached the cooperation clause in the policy and that OneBeacon suffered substantial prejudice as a result.[20] Northrop never argued to the trial court that OneBeacon's "failure to cooperate" affirmative defense should not have been submitted on the ground that "OneBeacon never showed it requested Northrop's cooperation before denying coverage." Although Northrop contends on appeal that its oral argument on the motions and its objection to the instruction at trial cured this defect, we disagree. A review of the record reveals that Northrop's oral arguments and objections relating to OneBeacon's submission of this defense did not assert that the evidence of this specific element of the defense was lacking.[21] For example, when objecting to Instruction No. 24—OneBeacon's "failure to cooperate" affirmative defense instruction—Northrop's counsel merely reiterated the arguments it raised in the motions for directed verdict:

> Your Honor, again, clause [sic] instruction involving the other two, the insurers. We think there's no evidence to support the submission of either element first or element second[22] and that there is no failure to cooperate in evidence nor are there prejudice for the failure to cooperate in the evidence, therefore, our direct verdict motion should have been sustained and all of its instructions should not be submitted.

---

[20] "[A]n insured's failure to comply with a cooperation clause supports an insurer's refusal to provide coverage when the insurer can show: (1) the insured materially breached the cooperation clause; (2) the insurer was substantially prejudiced as a result of the insured's breach; and (3) the insurer exercised reasonable diligence to secure the insured's cooperation." *Columbia Cas. Co. v. HIAR Holding, L.L.C.*, 411 S.W.3d 258, 272 (Mo. banc 2013).

[21] In its brief, Northrop cites to portions of the transcript in which its oral arguments relate to Wausau, not OneBeacon.

[22] Instruction No. 24 provided:

Your verdict must be for defendant OneBeacon if you believe:

First, Northrop failed to cooperate with defendant OneBeacon as to the claim or suit instituted by the December 2002 MDNR letter; and

Second, defendant OneBeacon was thereby prejudiced.

A claim of error is not preserved for our review where the appellant did not assert in its motion for directed verdict and motion for new trial that specific error raised on appeal. *See Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 163 (Mo. App. W.D. 1997), *overruled on other grounds by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. banc 2013); *see also Loutzenhiser v. Best*, 565 S.W.3d 723, 730 (Mo. App. W.D. 2018) ("Arguments not raised before the trial court . . . are not preserved for review on appeal."). "Parties are bound by the position they took in the trial court and will not be heard on a different theory on appeal." *Loutzenhiser*, 565 S.W.3d at 730; *see also City of Greenwood v. Martin Marietta Materials, Inc.*, 299 S.W.3d 606, 617 (Mo. App. W.D. 2009) ("Where, as here, the defendant challenged the submissibility of the nuisance count on a number of bases at trial, the defendant cannot, on appeal, challenge submissibility under a different theory.").

"We will not convict a trial court of error on an issue that was not put before the trial court to decide." *Loutzenhiser*, 565 S.W.3d at 730 (internal marks omitted). Therefore, we will not entertain this claim of error brought for the first time on appeal. *See id.*; *see also Barkley v. McKeever Enters., Inc.*, 456 S.W.3d 829, 839 (Mo. banc 2015) ("Appellate courts are merely courts of review for trial errors, and there can be no review of a matter which has not been presented to or expressly decided by the trial court."). Accordingly, Northrop's Point IV is denied.

*(B) The trial court did not err in submitting
London's "failure to cooperate" affirmative defense*

Northrop's fifth point relates to the submission of London's "failure to cooperate" affirmative defense. Specifically, Northrop asserts that the "trial court erred in submitting London's defense of failure to cooperate . . . because breach of cooperation is only a valid defense if the insurer presents evidence of both a 'material breach' by the insured of the cooperation clause and that the insurer suffered 'substantial prejudice' by any alleged noncooperation, which London

failed to do, in that London presented no evidence that Northrop materially breached the cooperation clause in its policies or that London was 'substantially prejudiced' by any alleged noncooperation by Northrop between Northrop's 2004 tender of the claim or suit instituted by the December 2002 MDNR letter and London's coverage denial on other grounds in 2011." We disagree.

An insurer may raise as an affirmative defense to liability that the insured failed to comply with a clause in the policy requiring the insured's cooperation. *See Nichols v. Preferred Risk Grp.*, 44 S.W.3d 886, 896 (Mo. App. S.D. 2001). "[A]n insured's failure to comply with a cooperation clause supports an insurer's refusal to provide coverage when an insurer can show: (1) the insured materially breached the cooperation clause; (2) the insurer was substantially prejudiced as a result of the insured's breach; and (3) the insurer exercised reasonable diligence to secure the insured's cooperation." *Columbia Cas. Co. v. HIAR Holding, L.L.C.*, 411 S.W.3d 258, 272 (Mo. banc 2013). Northrop's claim of error in this point is limited to the first two elements: breach and prejudice.[23] We find that, considering the evidence and reasonable inferences therefrom viewed in the light most favorable to the submission of the affirmative defense, and disregarding Northrop's evidence to the contrary, there was evidence tending to establish Northrop materially breached its duty to cooperate and London suffered substantial prejudice as a result.

---

[23] These were the two elements that the jury was required to find in Instruction No. 18 related to this defense, which provided:

> Your verdict must be for [defendant London] if you believe:
>
> First, Northrop failed to cooperate with [defendant London] as to the claim or suit instituted by the December 2002 MDNR letter; and
>
> Second, [defendant London] [was] thereby prejudiced.

The jury could have determined from the following evidence that Northrop materially breached the cooperation clause in the London policies.[24] Northrop first notified London of MDNR's 2002 letter asserting contamination had spread off-site in correspondence dated June 25, 2004. In December 2006, London advised that it had "reviewed the materials attached to [Northrop's] July 15, 2006 letter" and that "[t]he information received to date is insufficient to allow [London] to make a coverage decision . . . at this time." London further advised that its "initial investigation indicates that [Northrop] appears to have released its claims arising from the purported environmental contamination at the [Site] in the 1995 settlement agreement between [London and Northrop]." London requested that, if Northrop is "aware of additional information that [it] believe[s] may bear on these issues" "please bring it to [London's] attention immediately so that [London] may consider it."

In correspondence dated May 31, 2007, London advised that the information Northrop had "provided to date is insufficient to allow [London] to determine whether or not the current claim has been released." London requested that Northrop "please provide the following documents as well as any other information [Northrop] would like [London] to consider" in order "to allow [London] to complete [its] evaluation." London listed specific documents it was requesting from Northrop and further noted that previous documentation Northrop had provided was incomplete and only contained "the first few pages."

---

[24] The cooperation clause in the London policies stated:

> 9. <u>Assistance and Cooperation of the Insured</u>. The Insured shall cooperate with [London] and, upon [London's] request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. . . .

On August 20, 2008—over a year after London's request—Northrop provided some of the documentation London requested. On September 22, 2008, London advised that Northrop still had not provided all information requested.

In correspondence dated March 19, 2010, London advised that it had "asked [Northrop] to provide certain documents related to [Northrop's] position that the [Springfield Site] claim was not released in the prior settlement between [London and Northrop]" and that "[d]espite many requests, [London] ha[s] not yet received the requested information." London also advised that it was reserving all rights and defenses available to it under the policy and "[n]o waiver or estoppel of any kind is intended; neither should any be inferred."

In correspondence dated March 8, 2011, London advised that "[b]ased upon the evidence available to [London], coverage under the policies is denied." London denied Northrop's claim for coverage on two bases: (1) the claim was released in a 1995 settlement agreement between London and Northrop and (2) Northrop "failed to establish that a loss occurred during the pendency of the policies." London stated that if Northrop disagreed with this conclusion, London "will review additional evidence if [Northrop] suppl[ies] it," specifically seeking "evidence of when the hazardous waste discharges first began," "evidence of hazardous waste discharges at the [Site] during the policy period," and "information describing the nature, source and extent of the offsite contamination [and] when the contamination was first discovered." London concluded by advising that its "continued investigation of this matter is subject to a full and complete reservation of rights and defenses under the policies of insurance and applicable law. Neither anything in this letter, nor any act, should be construed as a waiver of any known or unknown rights or defenses."

The jury could have found from the above-described evidence that Northrop's repeated refusals to comply with requests for information and insufficient responses to requests for

documents, spanning numerous years, materially breached the cooperation clause in London's policies. London was entitled to conduct a complete investigation into Northrop's coverage claim—which included receiving records and documents from Northrop—and the jury could have determined from the evidence admitted that Northrop's lack of cooperation prevented it from doing so. *See Roller v. Am. Modern Home Ins. Co.*, 484 S.W.3d 110, 116 (Mo. App. W.D. 2015) ("Cooperation clauses are designed to enable the insurance company to possess itself of all knowledge, and all information as to other sources of knowledge, in regard to facts, material to their rights, to enable them to decide upon their obligations[.]" (internal marks omitted)); *id.* at 118 ("An insurer's right to a complete investigation also extends to the right to request the insured's financial records and other documents.").

Additionally, the jury could have determined that London suffered substantial prejudice as a result of Northrop's lack of cooperation. The jury could have found that Northrop's failure to provide the requested information impeded London's ability to fully and efficiently investigate the facts applicable to Northrop's claim for coverage, thereby prolonging London's coverage investigation; London repeatedly noted that the information Northrop did provide was insufficient to allow it to determine whether coverage applied. During the time period in which Northrop failed to provide the necessary information for London to make the coverage determination, Northrop engaged a private entity (SECOR) to conduct remediation and investigative efforts and, in conjunction with SECOR, submitted plans to MDNR regarding future activities Northrop intended to undertake to address on-site and off-site contamination. Additionally, beginning in July 2006, Northrop and MDNR engaged in settlement discussions regarding the entry of a new consent decree to address on-site contamination and the newly asserted claims of off-site contamination; those discussions culminated in the execution of the 2010 Consent Decree. The jury could have

inferred that Northrop's failure to cooperate with London during this time period hindered London's ability to meaningfully participate in these events and decisions, and denied it an opportunity to attempt to limit its liability. *See Johnston v. Sweany*, 68 S.W.3d 398, 402 (Mo. banc 2002) (insured's failure to comply with cooperation clause resulted in prejudice to the insurer because the insurer was "denied [its] opportunity to protect its interests," including its "opportunity to investigate the facts applicable to the subject of the lawsuit [and] to settle the dispute before trial").

Moreover, in its 2011 letter denying coverage, London sought information from Northrop that would allow it to reconsider its decision that a loss did not occur during the policy periods, including "evidence of when the hazardous waste discharges first began," "information describing the nature, source and extent of the offsite contamination," and "when the contamination was first discovered." Northrop had the greatest—if not the exclusive—knowledge of these circumstances. *See Roller*, 484 S.W.3d at 116 (An insured's failure to comply with reasonable requests for information may result in prejudice to the insurer "because the insured has perhaps the greatest knowledge of the circumstances" (internal marks omitted)). The evidence presented at trial allowed the jury to infer that Northrop did not make available to London information regarding the timing, discovery, nature, source, and extent of the contamination until Northrop instituted this coverage litigation. Such disclosure during litigation would not ameliorate the prejudice resulting from Northrop's initial failure to provide such requested information. *See id.* at 117 ("Missouri courts have consistently held that compulsory discovery in a lawsuit is no substitute for an insured's original cooperation."); *see also Wiles v. Capitol Indem. Corp.*, 215 F. Supp. 2d 1029, 1031-32 (E.D. Mo. 2001) (finding insured's failure to submit to an examination prior to litigation

prejudiced the insurer as a matter of law, despite insured's submission to a deposition after filing suit).

Missouri courts are clear that where reasonable persons could disagree whether the insured materially breached its insurance policy and the insurer suffered substantial prejudice as a result, the issues are questions of fact for the fact-finder to resolve. *See HIAR Holding*, 411 S.W.3d at 272 (whether an insurer suffers substantial prejudice as a result of the insured's failure to comply with the policy "is typically a question for a fact-finder"); *Meyers v. Smith*, 375 S.W.2d 9, 17 (Mo. 1964) ("[W]hat constitutes cooperation or lack of it in the defense of an action . . . is usually a question of fact for the judge or jury hearing the cause."); *cf. Hopfer*, 477 S.W.3d at 127 ("It was the jury's duty, not the trial court's duty, to consider the evidence presented at trial, weigh the evidence, and then determine the applicability of the affirmative defense."). Based on the evidence admitted in this case, we cannot say, as a matter of law, that London was not entitled to submit this defense to the jury.[25] Point V is denied.

---

[25] Contrary to Northrop's argument, the fact that London denied coverage for reasons other than Northrop's failure to cooperate does not preclude London from raising this defense as a matter of law. *See Interstate Cleaning Corp. v. Commercial Underwriters Ins. Co.*, 325 F.3d 1024, 1030 (8th Cir. 2003) (applying Missouri law) (an insurer's denial of coverage for specified reasons did not preclude insurer from later raising different defenses to coverage, particularly where the insurer stated in its letter denying coverage that it was not waiving any other policy terms or conditions); *Lero v. State Farm Fire & Cas. Co.*, 359 S.W.3d 74, 79 (Mo. App. W.D. 2011) (an insurer is not estopped from raising a defense to coverage "[a]bsent a statement [by the insurer] which excludes other defenses and upon which the party asserting coverage reasonably relies in preparing to preserve its claim" (internal marks omitted)). London advised in its correspondence to Northrop that it was reserving all defenses available to it under the policy and was not waiving any known or unknown defenses. Further, the cases cited by Northrop in support of this argument do not stand for the proposition that, as a matter of law, an insurer is precluded from raising a policy defense where it denied coverage on other grounds. *See Allen v. Bryers*, 512 S.W.3d 17, 36 (Mo. banc 2016); *HIAR Holding*, 411 S.W.3d at 272. Rather, in *Allen*, the Missouri Supreme Court held that an insurer who has wrongfully refused to defend an insured cannot later raise a policy defense (such as failure to cooperate) in a garnishment action because the insurer has breached the insurance contract. 512 S.W.3d at 36. In *HIAR Holding*, the Missouri Supreme Court found the defense of failure to cooperate was inapplicable under the particular (and stipulated) facts of that case. 411 S.W.3d at 272.

Northrop's sixth point relates to the instructions submitting London's and OneBeacon's "late notice of claim" affirmative defenses. Northrop asserts that the "trial court erred in giving Instruction Nos. 16 and 22 on London and OneBeacon's affirmative defenses of late notice of claim . . . because [these instructions] did not require the jury to find late notice as to the claim or suit instituted by the 2002 MDNR Claim." Northrop asserts that these instructions "improperly permitt[ed] the jury to reach a defense verdict based on late notice of a 'claim' not in the lawsuit," specifically, "an administrative penalty lawsuit filed by the MDNR in the early 1980s relating to the closure of the A/B Lagoon." We disagree that the submission of these instructions was erroneous.

Instruction Nos. 16 and 22 were identical—other than the identification of the defendant insurer—and provided as follows:

Your verdict must be for [defendant insurer] if you believe:

First, the Missouri Department of Natural Resources (MDNR) brought a claim for environmental pollution against plaintiff Northrop, and

Second, plaintiff Northrop did not immediately forward the claim to [defendant insurer], and

Third, [defendant insurer] was thereby prejudiced.

In determining if an instruction is proper, "[t]he test is whether the instruction follows the substantive law and can be readily understood by the jury." *Alhalabi*, 300 S.W.3d at 527. Instruction Nos. 16 and 22 were readily understandable and consistent with MAI 32.24, the applicable Missouri Approved Instruction for this affirmative defense, which provides:

Your verdict must be for defendant if you believe:

37

> First, plaintiff *(describe violated policy condition, e.g., "failed to submit a proof of loss to defendant within the time prescribed by the policy")*, and
>
> Second, defendant was thereby prejudiced.

As required by MAI 32.24, Instructions Nos. 16 and 22 described the policy conditions alleged to be violated consistent with the language in the London and OneBeacon policies.[26]

Furthermore, these instructions were properly limited to submitting ultimate facts, not evidentiary details. Northrop argues that the instructions were erroneous because they allowed the jury to find against Northrop based on the 1980s lawsuit relating to the closure of the A/B Lagoon, and that such lawsuit had "nothing to do with the 2002 MDNR Claim and MDNR Lawsuit." However, the extent of what encompassed the "claim" described in Instruction Nos. 16 and 22 was for the jury to decide based on the evidence presented. The 1993 administrative claim brought by MDNR relating to on-site contamination resulted in the 1993 Consent Agreement, which was superseded by the 2010 Consent Decree, which was based on the 2002 MDNR claim, which encompassed both the on-site contamination contemplated by the 1993 Consent Agreement and the newly discovered off-site contamination. Similarly, the early 1980s lawsuit filed by MDNR against Northrop was related to pollution discovered in the A/B Lagoon, one of the Areas of Concern in the present coverage litigation.[27] In light of the nature of the contamination at issue in this coverage action and MDNR's historical involvement with the Site, we find the trial court did

---

[26] The relevant provision in the London and OneBeacon policies stated:

> 8. <u>Notice of Claim or Suit.</u> If claim is made or suit is brought against the Insured, the Insured shall immediately forward to [the insurer] every demand, notice, summons or other process received by him or his representative.

[27] In response to the limited evidence at trial as to the existence of the 1980s lawsuit, Northrop presented testimony that the lawsuit had nothing to do "whatsoever" with its "waste-handling practices during the 1964-to-1972 time frame" or "with TCE either." In other words, Northrop presented evidence that the lawsuit was not part of its claim for coverage.

not err by declining to limit the "claim" described in Instruction Nos. 16 and 22 to the "claim or suit instituted by the 2002 MDNR Claim." *See Alhalabi*, 300 S.W.3d at 527 ("A proper instruction submits, not evidentiary details, but only the ultimate facts, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another."); *BMK Corp. v. Clayton Corp.*, 226 S.W.3d 179, 190 (Mo. App. E.D. 2007) (the trial court was not required to define or explain a phrase used in the instruction where "[t]hroughout the course of the trial, each side proffered its meaning of the phrase" and the jury was able to consider "the evidence presented at trial to determine its meaning").

For these reasons we find the trial court did not err in submitting Instruction Nos. 16 and 22 to the jury. Point VI is denied.

### (D) The trial court did not err in submitting London's and OneBeacon's "late notice of claim" affirmative defenses

Northrop's seventh point relates to the submission of London's and OneBeacon's "late notice of claim" affirmative defenses. Northrop asserts the trial court erred in submitting these defenses because they "require the insurer show 'actual prejudice' from alleged late notice which London and OneBeacon failed to do, in that they could not show 'actual prejudice' because they provided no evidence of prejudice beyond speculation and denied coverage on other grounds." We disagree, and find there was sufficient evidence of prejudice to submit these defenses to the jury.[28]

To establish a "late notice of claim" defense, "Missouri law requires the insurer to establish . . . that it was prejudiced by a late claim in the sense that the company could not adequately investigate or defend the claim." *Reid v. Conn. Gen. Life Ins. Co.*, 17 F.3d 1092, 1098 (8th Cir. 1994) (applying Missouri law); *see also Sweany*, 68 S.W.3d at 402 (insured's failure to comply

---

[28] Northrop does not dispute in this appeal that its failure to notify London and OneBeacon of the 2002 MDNR letter until mid-2004 provided sufficient evidence from which the jury could find that Northrop breached the "notice of claim or suit" policy provisions.

with policy condition caused the insurer to suffer prejudice because the insurer was "denied [its] opportunity to protect its interests"). "'Prejudice' under Missouri law can certainly mean that an insurance company is obligated to pay something as a result of a late claim which it would not have been obligated to pay had the claim been timely[.]" *Reid*, 17 F.3d at 1099. "However, 'prejudice' can also mean simply that the insurance company was not given a meaningful opportunity to make its own preliminary investigation where such an investigation is called for on the facts of a particular case." *Id.*

Viewed in the light most favorable to the submission of the affirmative defenses, the evidence tended to establish that London and OneBeacon suffered prejudice from Northrop's delayed notice of claim. In response to the MDNR's 2002 letter, but prior to Northrop notifying London and OneBeacon of that letter, Northrop, in conjunction with SECOR, undertook various remedial and investigative efforts and submitted work plans to MDNR advising of the future activities Northrop intended to undertake associated with on-site and the newly identified off-site contamination. The jury could have inferred that Northrop's delay in notifying London and OneBeacon of the 2002 MDNR claim prevented them from being involved in decisions regarding future remedial and investigative efforts relating to the contamination, for which Northrop ultimately sought coverage from the insurers. *See Sweany*, 68 S.W.3d at 402 (insurer suffered prejudice where it was "denied [its] opportunity to protect its interests").

Furthermore, evidence was presented from which the jury could have found that delays in notice prejudiced the insurers in their investigation and evaluation of Northrop's claim. Defense witness Russell Juncal, a geologist and hydrologist who began evaluating the Site in approximately 2006, stated that "waiting that long before getting the information affected the ability and the cost of [his] evaluation." He testified about the loss of physical evidence and witness testimony and the

danger of "degradation of evidence," specifically noting that with testimony a major concern is "potential loss of memory with time." Regarding individuals with knowledge of Northrop's operations at the Site, he testified that their memories would have been better closer in time to when the events at issue occurred. He further described individuals who had constructed some of the Areas of Concern and were involved in Northrop's "day-to-day" operations, noting these persons had "important knowledge," but they had passed away.

Additionally, Juncal testified as to the importance of having certain evidence when conducting contamination investigations and the resulting difficulties if such evidence is lost or unavailable. He stated that forensic analysis is like building a jigsaw puzzle in some ways, "except often a number of the pieces of the puzzle are missing, as they are here." He agreed that "there's more puzzle pieces . . . the closer back in time you go to the events." Juncal testified that by the time he was involved, there were records that would have made it "easier to put [the] puzzle together," but they were lost. For example, he specifically testified as to Northrop records he would have "expect[ed] to see" prior to 2004, and that he would have preferred to use such records in his evaluation: "when did they first start to use TCE and how much," "how much production did they have; records about the ramp up. I've had to use differential methods but it was hard information about this that I would have wanted to have." He also stated he would have benefitted from seeing a more complete set of building plans, and that this was "part of the degradation of evidence kind of concept [he] talked about earlier."

Defense witness Robert Karls echoed Juncal's testimony that the unavailability of complete records impeded the efficient investigation of the claim. Karls testified that having full records available, such as complete building subsurface plans, would have allowed for a more efficient investigation. Regarding the investigation he also stated that the "technical costs, the ones for

41

environmental consulting, drilling the holes, sampling, things like that" could have been "more efficient if more records were available." In sum, the jury could have found from Juncal's and Karls's testimony that the insurers' ability to conduct a complete and efficient investigation into Northrop's claim was hindered by Northrop's delay in notifying the insurers of the claim, thereby resulting in substantial prejudice to London and OneBeacon. *See Reid*, 17 F.3d at 1098 (an insurer can show it was prejudiced by a late claim "in the sense that the [insurer] could not adequately investigate or defend the claim").

It is well-settled that "the presence or absence of prejudice [resulting from late notice] is an issue of fact to be determined on the particular facts of each case." *Tresner v. State Farm Ins. Co.*, 913 S.W.2d 7, 11 (Mo. banc 1995); *see also Greer v. Zurich Ins. Co.*, 441 S.W.2d 15, 31-32 (Mo. 1969); *Sherman v. Mo. Prof'ls Mutual-Physicians Prof'l Indem. Assoc'n*, 599 S.W.3d 207, 219 (Mo. App. W.D. 2020) (The presence or absence of prejudice resulting from late notice of a claim "is typically a question of fact for the fact-finder."). Based on the particular facts of this case, as described above, we find that whether London and OneBeacon suffered substantial prejudice from Northrop's late notice of claim was a question to be determined by the jury. Therefore, London and OneBeacon were entitled to submit their "late notice of claim" defenses to the jury, and Point VII is denied.[29]

## Conclusion

We reverse the portion of the trial court's judgment declaring Wausau is obligated to pay Northrop's future defense costs associated with the 2010 Consent Decree and MDNR Lawsuit.

---

[29] As described above in our discussion of Point V, the fact that London and OneBeacon denied coverage for reasons other than late notice of claim did not estop these insurers from raising this coverage defense. OneBeacon, like London, stated in its denial of coverage letter that it was reserving its defenses under its policies and that nothing in the letter should be construed as a waiver of any known or unknown defenses.

We affirm the judgment in all other aspects and remand to the trial court for entry of judgment consistent with this opinion.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

43